Curtis HARRIS, Petitioner,

v.

Robert KUHLMANN, Superintendent, Sullivan Correctional Facility, Respondent.

No. 97–CV–2289(JS).

United States District Court, E.D. New York.

Sept. 19, 2000.

Curtis Harris, pro se, Fallsburg, NY, for Petitioner.

Peter A. Weinstein, Margaret E. Mainusch, Assistant District Attorney, Nassau County District Attorney's Office, Mineola, NY, for Respondent.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court is the petition of Curtis Harris ("Petitioner" or "Harris"), proceeding *pro se*, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted of murder, burglary and robbery in February 1985. Later that same year, Petitioner pled guilty to attempted murder in connection with his attempted escape before his trial. Harris currently is serving an indeterminate term of custody of thirty-seven and one-half years to life on the murder, burglary and robbery charges, and a consecutive term of imprisonment of seven and one-half to fifteen years on the attempted murder charge.

Petitioner raises four grounds for the relief sought. First, Petitioner alleges that his conviction was obtained by statements obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Second, Petitioner argues that the prosecution unlawfully excluded black jurors from the jury, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Third, Petitioner argues that he was not competent to stand trial on the murder, robbery and burglary charges, and that he was not competent to plead guilty to the attempted murder charge. Finally, Petitioner contends that his sentences for the crimes he committed are unconstitutionally excessive.

The evidence of Harris' guilt on all the charges is overwhelming. Nevertheless, a federal court on habeas review is not charged with determining guilt or innocence, but rather with ensuring that a petitioner is not being held in violation of the Constitution. A federal court may not simply ignore the well-established mandates of the Constitution simply because the end result was correct. Thus, although it gives the Court no particular pleasure to prolong these proceedings, the Court finds that Harris' due process rights, as guaranteed by the Fourteenth Amendment, were violated by the exclusion of five black jurors from the jury that heard and deliberated over his case. The Court further finds that, as a constitutional matter, substantial questions about Petitioner's competency to proceed to trial were raised, and that the trial court impermissibly failed to order a competency hearing when Petitioner's competency was reasonably in doubt. Therefore, for the reasons discussed below, the petition is granted.

## PROCEDURAL BACKGROUND

On February 7, 1985, a jury in Nassau County Court found Petitioner guilty, under indictment number 57785, of one count of intentional murder in violation of New York Penal Law § 125.25[1]; two counts of felony murder in violation of N.Y. Penal Law § 125.25[3]; one count of burglary in the first degree, a violation of N.Y. Penal Law § 140.30[2]; and one count of robbery in violation of N.Y. Penal Law § 160.15[1]. The convictions followed Petitioner's trial before the Honorable Stuart L. Ain. Petitioner later was sentenced by Judge Ain to an indeterminate term of twenty-five years to life on each of the three murder counts, and twelve and one-half to twenty-five years on each of the burglary and robbery counts.

Later that year, Harris pled guilty, under indictment number 59972, to attempted murder in the second degree, in violation of N.Y. Penal Law §§ 110–00/125.25[1]. This conviction resulted from Harris' attempt to escape from custody, during which both a court security officer and Petitioner were shot.[1] Petitioner originally had been charged in this indictment with escape in the first degree, in violation of N.Y. Penal Law § 205.15[2]; aggravated assault upon a police officer, in violation of N.Y. Penal Law § 120.11; and four counts of assault in the second degree, in violation of N.Y. Penal Law § 205.05[2,3,6,7]. However, Petitioner pled guilty to the attempted murder charge in full satisfaction of all the charges contained in the indictment.

Petitioner thereafter was sentenced to seven and one-half to fifteen years, to run consecutively to the sentence previously imposed under indictment number 57785. This sentence also was imposed by Judge Ain in the County Court of Nassau County.

Petitioner appealed both of the convictions to the Supreme Court of New York, Appellate Division, Second Department. In that appeal, Harris presented the following claims: (1) that the conviction under indictment number 57785 was unlawfully obtained by introduction of statements obtained in violation of *Miranda;* (2) that the prosecutor used his peremptory challenges to unlawfully exclude black jurors in violation of *Batson;* (3) that Petitioner was not competent to stand trial or take a plea because of his low IQ and the impact of the bullet that had lodged in his brain as a consequence of being shot during his escape attempt; and (4) that Petitioner's sentence was excessive.

In a five-paragraph decision, the appellate court essentially affirmed the judgments of conviction. However, the court *sua sponte* found that the evidence supporting Petitioner's intentional murder conviction was insufficient as a matter of law. The court reversed that part of the conviction under the first count of indictment number 57785, and vacated that portion of the sentence. *People v. Harris,* 160 A.D.2d 726, 555 N.Y.S.2d 607 (2d Dep't 1990).

Petitioner then sought leave to appeal to the New York State Court of Appeals. By Order dated September 14, 1990, the court, per Titone, J., denied leave to appeal. *People v. Harris,* 76 N.Y.2d 893, 561 N.Y.S.2d 555, 562 N.E.2d 880 (1990).

Harris filed the present application for a writ of habeas corpus on April 25, 1997.

---

1. On September 21, 1984, while Petitioner and his co-defendant accomplice Julio Giano were at the courthouse for pretrial proceedings, the two attempted to escape from custody. Petitioner and Giano were handcuffed to each other in an elevator with two corrections officers. Giano threw ammonia in one of the officers' eyes. Petitioner grabbed a gun. The elevator stopped at the ground floor and the door opened. Another corrections officer, Anthony Greco, was on the ground floor outside the elevator door. Harris shot twice at Officer Greco. *See* Minutes of Change of Plea, April 25, 1985 ("Plea Minutes"), at 16–18; *see also Giano v. Kelly,* No. 89–CV–727(C), 2000 WL 876855, at *9 (W.D.N.Y. May 16, 2000) (describing crimes committed by Harris and Giano and their escape attempt).

As grounds for relief, Petitioner presented the same grounds that he first argued on direct appeal to the Second Department. In fact, after listing the grounds one by one in the petition itself, Petitioner annexed a copy of his brief on direct appeal to the Second Department, presumably as an exhibit to his petition. On December 29, 1997, this Court dismissed the petition as time-barred pursuant to the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. §§ 2244 and 2254 ("AEDPA"). Petitioner appealed the dismissal of his petition. On September 28, 1998, the United States Court of Appeals for the Second Circuit vacated this Court's Order of Dismissal and remanded this case for a determination (1) whether Petitioner timely filed his petition and (2) if the petition was timely filed, for consideration of its merits.

Respondent opposes Petitioner's application for a writ of habeas corpus. Respondent correctly concedes that each of Harris' claims is exhausted,[2] but contends that the claims are without substantive merit.

### FACTS UNDERLYING THE TWO INDICTMENTS

On August 30, 1983, petitioner and co-defendant Julio Giano, with the express purpose of committing a robbery, drove to the home of Vicki Kestoglou, apparently Giano's former girlfriend, in Manhasset Hills, New York. Trial Transcript ("Tr.") 116–118. Pursuant to their plan, Giano entered the house first while Petitioner waited outside in the car. Petitioner remained outside the house for five minutes, then exited the car and rang the doorbell. When Kestoglou answered the door, Petitioner asked if he could use the bathroom. Giano told Kestoglou that everything was alright, because Petitioner was with him.

After Petitioner went into the bathroom, Giano pulled a gun on Kestoglou, holding a silver automatic to her head. Giano threatened to kill Kestoglou. Harris helped Giano tie up Kestoglou with a ripped bed sheet, and then watched as Giano brutally strangled Kestoglou with a cord. Although Harris protested Giano's attempt to strangle Kestoglou, Giano told him that he had to kill her because she knew him. Petitioner ran from the house and waited in the car. When Giano returned, Petitioner asked Giano what had taken so long. Giano told Harris that Kestoglou was "very hard to kill." The two then drove away with the meager proceeds of their crime: a plastic bag containing jewelry and coins, and a small television set. Tr. 117–18. Kestoglou was dead. Tr. 100–03.

Petitioner later gave a written statement to the police, confessing to his role in the crimes. Tr. 120–133; see also Respondent's Brief to the Appellate Division, Second Department, Appendix 1 (written confession). Petitioner also agreed to give a videotaped confession, which tape later was played for the jury. Tr. 217–19.

On September 21, 1984, while trial for these crimes was pending, Petitioner and Giano escaped from the custody of a court officer at the County Courthouse in Mineo-

---

2. Respondent makes a fruitless attempt to argue that Harris' *Batson* claim is exhausted only as to one of the five excluded black jurors. *See* Respondent's Memorandum of Law in Opposition to Petition, at 11–13; *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."). However, this argument certainly was not Respondent's position on direct appeal, where Respondent pointed out that "defendant, who is black, alleges that the prosecutor used five peremptory challenges in a racially biased manner to exclude five black members of the venire." Respondent's Brief to the Appellate Division, Second Department, at 27. Respondent repeated throughout its brief the fact that Harris challenged the removal of all five black prospective jurors. *See id.* at 28, 31, 33, 35, 38, 39. It is apparent that Harris has fully exhausted the remedies available to him in state court on his *Batson* claim as to all five excluded black venire persons. Moreover, the striking of even one black venire person, because of his or her race, violates the Constitution. *United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir.1989) (per curiam).

la, New York. Affidavit of Margaret E. Mainusch, Esq., dated December 14, 1998, ¶ 7. During a shootout that ensued when court officers sought to recapture him, Petitioner shot a court officer in the head. *Id.* Petitioner himself also was shot in the head. *Id.* The bullet that hit Petitioner passed through the midline of his skull and lodged in the central ventricle of his brain. Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus, at 3. The bullet has never been removed. *Id.*

### PRETRIAL HEARINGS

Prior to trial, and before his escape attempt, Petitioner moved to suppress the inculpatory statements he made to the police during the course of the investigation into Kestoglou's murder. Hearings held pursuant to the motion included the testimony of Detective James Magee, of the Nassau County Police Department. Hearing Minutes ("H.M.") 20. Detective Magee testified that he had questioned Petitioner about the retrieval of the items taken from the Kestoglou home. Without prompting, Harris told Detective Magee that he was present at Kestoglou's house, but that he did not kill Kestoglou. H.M. 25. At this point Detective Magee, reading from a card, advised Harris of his constitutional rights under *Miranda.* Petitioner indicated that he understood these rights by signing the back of the rights card that was read to him. H.M. 30. Petitioner further indicated that he was willing to answer questions without the presence of an attorney. H.M. 29–30. Petitioner then made a full oral confession. H.M. 31.

Detective Magee also asked Petitioner if he was willing to give a written statement, a request to which Harris consented. H.M. 31–39. Detective Magee reduced Petitioner's confession to a written statement, with Harris' help. H.M. 39. Petitioner was asked to make any corrections, additions or deletions, and sign his name at the bottom of each page and sign the last page, and include his address. H.M. 40. Petitioner did each of these things.

H.M. 40. In the confession, Petitioner admitted his participation in the burglary and robbery, and to Kestoglou's murder. H.M. 33–35.

Dr. Roger P. Feldman, a psychiatrist, testified on behalf of the Petitioner. H.M. 243. Dr. Feldman was qualified as an expert in psychiatry. Dr. Feldman testified that Harris functioned at an IQ level of between seventy and eighty. H.M. 259. As a result of his low IQ, Dr. Feldman stated that Petitioner could only understand *Miranda* warnings if they were explained in detail and paraphrased in simpler language. H.M. 260. The expert also testified that repetition could increase Petitioner's understanding of *Miranda* warnings.

Petitioner's mother and father also testified at the hearings. Yvonne Harris testified regarding Petitioner's learning disabilities and his classification as "educationally retarded" in the second grade. H.M. 316. Mrs. Harris also testified that her son had a very bad problem with alcohol from the time he turned fourteen. H.M. 324. She further testified that Petitioner had great difficulty understanding many things, and that he had to be told things over and over until he "would kind of understand it." H.M. 325. Mrs. Harris also testified that her son read at a first-grade level and that his reading comprehension was minimal. H.M. 328–29. Petitioner's father testified that his son had very poor eyesight and had trouble reading. H.M. 336–37.

At the conclusion of the hearings, Judge Ain denied Petitioner's motion to suppress the confession. Judge Ain held that Petitioner fully comprehended the meaning and import of the *Miranda* warnings. *See* Respondent's Brief to the Appellate Division, Second Department, Appendix 2 (decision of Hon. Stuart L. Ain, dated December 4, 1984), at 9.

### JURY SELECTION

On January 2, 1985, the case proceeded to trial, with jury selection the first task of the day. The first black venire person to

be examined was a prospective juror named Mr. McGruder. Both the prosecution and the defense accepted McGruder for the jury panel. However, on the following day, before any additional jurors had been selected, McGruder told the court that in 1961 he had been charged with a misdemeanor involving the carrying of weapons, that he was convicted, that he received a suspended sentence, and that he thereafter was granted a certificate of relief from civil disabilities. Minutes of Voir Dire Proceedings ("V.D.") 107–08. McGruder had failed to provide this information when questioned by the judge during his examination the previous day. As a result of this disclosure, the assistant district attorney asked that McGruder be dismissed for cause, or in the alternative, that he be permitted to utilize a peremptory challenge to strike McGruder. V.D. 108.

The court denied the challenge for cause, but allowed the prosecutor to exercise a peremptory challenge over the objection of defense counsel. V.D. 108–13. Defense counsel noted that McGruder was one of a few number of blacks on the panel of prospective jurors, and that he had no objection to McGruder in light of his receipt of relief from civil disabilities. V.D. 109. The trial judge was not persuaded, and McGruder was peremptorily struck by the assistant district attorney.

Thereafter, during the course of jury selection, four other blacks were peremptorily challenged and excused by the assistant district attorney: Mrs. Corring, Mr. Creeon, Mr. Jones and Mr. Mohammed.

V.D. 242. As a result, Petitioner was tried before an all-white jury. Respondent's Memorandum of Law in Opposition to Petition, at 11.

Petitioner's counsel, Thomas Liotti, Esq., raised the problem of the assistant district attorney's complete exclusion of blacks before the trial judge.[3] V.D. 245–246. With the prodding of the court, Mr. Liotti asserted a claim that "there was a systematic [a]nd purposeful exclusion of blacks and black persons from this jury by [the assistant district attorney]." V.D. 242. The prosecutor, Daniel Cotter, Esq., denied any systematic exclusion of black jurors, and stated that pursuant to the then-existing law as stated by the New York Court of Appeals, he was allowed to exercise peremptory challenges in any manner he saw fit. V.D. 247–48.

In accordance with *McCray*, Mr. Liotti moved for a hearing to discuss the selection of the jurors. V.D. 241–242; *see also McCray*, 750 F.2d at 1134 (noting that once a prima facie case of discrimination has been made out, the court should conduct a hearing to ensure that prospective jurors had not been removed for improper reasons). The motion was denied. V.D. 249.

## THE TRIAL, THE GUILTY PLEA, AND SENTENCING

Petitioner's trial was short and uneventful. After a little more than two days of trial, the jury deliberated and found Harris guilty of three counts of murder in the second degree, one count of burglary in

3. *Batson v. Kentucky* was decided on April 30, 1986. Therefore, Mr. Liotti's application on January 4, 1985, preceded the Supreme Court's *Batson* decision by approximately sixteen months. As the basis for the application, however, Mr. Liotti invoked a then-recent decision by the United States Court of Appeals for the Second Circuit, *McCray v. Abrams*, 750 F.2d 1113, 1133 (2d Cir.1984), which held that a prosecutor may not use peremptory challenges in a racially discriminatory manner. The trial judge, as well as the assistant district attorney, were marginally aware of the *McCray* ruling. V.D. 241–42, 248.

Subsequently—although too late for Petitioner's trial—the Supreme Court held that *Batson* must be applied retroactively to all cases not yet final, or on direct appeal, as of April 30, 1986. *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Thus, while *Batson* had not been decided at the time of Mr. Liotti's challenge, the *McCray* case was the prevailing law of the Second Circuit at that time. And finally, as a result of *Griffith*, *Batson* was the prevailing law at the time of Harris' direct appeals to the Second Department and the New York Court of Appeals.

the first degree, and one count of robbery in the first degree. Tr. 385. Petitioner subsequently was sentenced to twenty-five years to life on each of the three murder counts and twelve and one-half to twenty-five years on each of the burglary and robbery counts.

A few months later, on April 25, 1985, Petitioner offered to plead guilty to attempted murder in the second degree, in satisfaction of all charges contained in the indictment relating to his escape attempt. At the plea proceeding, Judge Ain made it clear to Harris and to Mr. Liotti that Harris needed to fully comprehend and understand what was occurring with respect to his plea. Plea Minutes, at 7. At the proceeding, Petitioner told the court that he did not read or write English. Plea Minutes, at 3. Harris' counsel had to paraphrase and explain each of the court's questions to Petitioner, in order to make sure Harris understood what was transpiring at the proceedings. Plea Minutes, at 8. After this extensive proceeding, which included Petitioner's conferences with his attorney after every question, the court was satisfied that Petitioner "ha[d] acknowledged his guilt and [wa]s willing to assume responsibility for it." Plea Minutes, at 22. The court then accepted Harris' guilty plea to a charge of attempted murder in the second degree. Plea Minutes, at 23. Judge Ain later sentenced Petitioner to a term of imprisonment of seven and one-half to fifteen years for this offense.

## DISCUSSION

### I. Timeliness of Petition

■ As an initial matter, the Court holds that pursuant to the prevailing law of the Second Circuit, Harris' petition for a writ of habeas corpus, filed in this Court on April 25, 1997, was timely. *See Clark v. Stinson,* 214 F.3d 315, 319 (2d Cir.2000) (reiterating "the general rule that a prisoner had until April 24, 1997 to avail him or herself of habeas relief in federal court"). The petition was received by the Pro Se Office of the Eastern District one day after the generally applicable deadline. However, the petition was signed by Harris on April 21, 1997, as was Harris' application to proceed in forma pauperis. Although the envelope in which Harris' petition was mailed is not found in the case file maintained by the Clerk of the Court, the envelope which contained the IFP application is attached to that application, and is postmarked April 22, 1997.

Pursuant to the Court of Appeals' September 28, 1998 mandate, which constitutes the law of this case, the Court must determine whether the petition was timely filed with prison officials on or before April 24, 1997. Given that the IFP application was received by the Eastern District's Pro Se Office on April 24, 1997, with an April 22, 1997 postmark, and the petition itself was received by the pro se office on April 25, 1997, it is abundantly clear that Harris' petition was, in fact, filed with prison officials on or before April 24, 1997. Therefore, the Court holds that Harris' petition was timely filed pursuant to 28 U.S.C. § 2244(d)(1). The Court thus proceeds to determine the merits of the petition.

### II. Failure to Comprehend *Miranda* Warnings Claim

■ Petitioner claims that although he was administered *Miranda* warnings as required by the Fifth Amendment to the Constitution, he could not understand the warnings because of his low IQ and his history of learning disabilities. As a result of his inability to understand the warnings he admittedly was provided, Petitioner argues that the inculpatory statements he made should have been suppressed, and that his waiver of the right to an attorney was invalid. *See* Petition, ¶ 12.A; *see also Dickerson v. United States,* —— U.S. ——, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000) (holding that the warnings required by *Miranda* are constitutionally based, and upholding *Miranda*'s "core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief.").

Because this precise issue already has been litigated in the courts of the State of New York, this Court's duty in analyzing this claim is constrained by 28 U.S.C. § 2254(d)(1). This section provides that [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Francis S. v. Stone,* 221 F.3d 100, 107–11 (2d Cir.2000) (analyzing federal court's standard of review in analyzing claims previously adjudicated in state courts); *Clark,* 214 F.3d at 320–21 (same).

Petitioner previously raised this exact claim to the trial court—which held hearings on the matter—and on direct appeal to the Appellate Division, Second Department and to the New York Court of Appeals. The trial court issued a written decision, and held that Harris' argument that he was too mentally feeble to understand the *Miranda* warnings given by Detective Magee was without merit.

Judge Ain pointed out that (1) Harris had been arrested on prior occasions and thus was no stranger to *Miranda* warnings; (2) Harris had been represented on previous occasions by a public defender and therefore knew that he did not have to pay for an attorney, but that one would be appointed for him by the court; (3) during this investigation, Harris had been provided *Miranda* warnings. on numerous occasions, and had the opportunity to read those warnings from a printed police form; and (4) Harris did not even raise his alleged confusion regarding his right to

counsel until his second interview with Dr. Feldman, and after he had been studying the issue on his own. Judge Ain wrote that it was "clear to this court that Harris fully and completely understood the immediate meaning of the warnings." *See* Respondent's Brief to the Appellate Division, Second Department, Appendix 2 (decision of Hon. Stuart L. Ain, dated December 4, 1984), at 7–9. The trial court judge also pointed out that "[a]n inability to comprehend the import of the *Miranda* warnings in the larger context of criminal law generally does not of itself vitiate the validity of the waiver." *Id.* at 9 (quoting *People v. Williams,* 62 N.Y.2d 285, 476 N.Y.S.2d 788, 465 N.E.2d 327 (1984)). The court did not cite to any federal law in support of the decision that Petitioner understood his constitutional rights and that the waiver of those rights was valid.

The Second Department affirmed the trial court on this issue. The court did not specifically address this argument on appeal, but merely pointed out that it had considered and rejected Harris' argument on this point. Harris' brief to the Second Department did not cite to any federal law on this point other than the *Miranda* decision itself. The appellate court likewise failed to cite to any federal law in its decision rejecting this claim, but did cite to the New York Court of Appeals' decision in *Williams,* 62 N.Y.2d 285, 476 N.Y.S.2d 788, 465 N.E.2d 327.

In *Williams,* the court analyzed the validity of a waiver of a mentally impaired defendant's rights under *Miranda.* Defendant Williams was a twenty year-old, functionally illiterate, borderline mentally retarded man who also suffered from brain damage resulting from a car accident during his youth. *Williams,* 62 N.Y.2d at 287, 476 N.Y.S.2d at 789, 465 N.E.2d 327. Compounding his difficulties, Williams also had been hospitalized in the past for psychotic episodes. *Id.*

After surveying the controlling principles derived primarily from federal law, the New York Court of Appeals held that

"[a]n individual may validly waive *Miranda* rights so long as the immediate import of those warnings is comprehended, regardless of his or her ignorance of the mechanics by which the fruits of that waiver may be used later in the criminal process." *Williams*, 62 N.Y.2d at 289, 476 N.Y.S.2d at 790, 465 N.E.2d 327 (citing *Harris v. Riddle*, 551 F.2d 936, 938–39 (4th Cir.1977)). The court began with the fundamental tenet that the validity of a defendant's waiver of his or her rights must be knowingly and intelligently made. 62 N.Y.2d at 288, 476 N.Y.S.2d at 790, 465 N.E.2d 327 (citing *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The court held that this inquiry necessarily was a factual one, and that courts must carefully scrutinize the totality of the circumstances in determining whether the waiver was valid. 62 N.Y.2d at 289, 476 N.Y.S.2d at 790, 465 N.E.2d 327. An accused's mental deficiency or cerebral infirmity is but one factor to consider. *Id.*

Cases from the federal courts align closely with the standards enunciated in *Williams.* In fact, a recent case from the Seventh Circuit is similar in many ways to the facts of the present case, and clearly sets forth the relevant law on the subject. The habeas corpus petitioner in *Rice v. Cooper*, 148 F.3d 747 (7th Cir.1998), was an illiterate and mildly retarded sixteen year-old at the time he was arrested and questioned for the murder of four residents of a Chicago apartment building. Petitioner Rice had tossed a bottle of gasoline into the building, where it exploded, setting the building on fire.

The question before the Seventh Circuit was the same as that now before this Court: "[w]hether the incriminating statements that [petitioner] made at the time of his arrest after waiving his right to remain silent or consult a lawyer should have been suppressed because of his mental condition." *Id.* at 750. As pointed out by the Seventh Circuit, this issue "raises the interesting general question of the duty, if any, of the police to protect a mentally impaired person from incriminating himself." *Id.*

Importantly, the *Miranda* decision itself explicitly provides that the Fifth Amendment right against self-incrimination—composed primarily of the right to remain silent and the right to an attorney—may be waived provided that the waiver is made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. In a subsequent case, the Supreme Court identified two requirements to consider when determining whether a waiver is valid:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quotation marks and citation omitted).

With Harris' situation, the central problem is obvious: what does a court do with a defendant's argument that because of a demonstrated mental handicap, he was unable to "intelligently" waive his constitutional right because he lacked the capacity to comprehend the nature of the right and/or the consequences of the waiver of that right? The Court believes that the answer to this question was answered appropriately by the Seventh Circuit in *Rice:*

> A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. *Colorado v. Connelly*, 479 U.S. 157, 169–71, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The rele-

vant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers. From this it might be argued that officers are free to recite the standard *Miranda* warnings to anyone they arrest, regardless of the person's evident mental condition, and to accept the person's waiver. But this has to be wrong, though we cannot find a case that says so. If the suspect is a small child, or if it is apparent that he cannot speak English, then attempting to extract a waiver of *Miranda* rights is pretty obviously an abusive practice, as it is a calculated, conscious effort to extract a decision that is not the product of a rational choice. And likewise if it is apparent that because of illness, insanity, or mental retardation the suspect is incapable of rationally waiving his *Miranda* rights. The significance of the principle of *Connelly*, the principle that the Constitution doesn't protect the suspect against himself, is that if he understands the *Miranda* warnings yet is moved by a crazy impulse to blurt out a confession, the confession is admissible because it is not a product of coercion. The police have given him his *Miranda* warnings in an intelligible form; it is not their fault that he is impulsive. It is different, if perhaps only by a shade, if the police question him knowing that he does not understand his rights.

On this analysis, the knowledge of the police is vital. If they have no reason (there was none in *Connelly, see* 479 U.S. at 161–62, 107 S.Ct. 515) to think that the suspect doesn't understand them, there is nothing that smacks of abusive behavior. It would seem to follow that the question is not whether if Rice were more intelligent, informed, balanced, and so forth he would not have waived his *Miranda* rights, but whether the police believed he understood their explanation of those rights; more precisely, whether a reasonable state court judge could have found that the police believed this.

*Rice*, 148 F.3d at 750.

Applying these principles to the present case, the Court concludes that the trial court's conclusions of law were neither contrary to, nor an unreasonable application of, clearly established federal law. The record is devoid of any evidence of police coercion, and there is no argument that Detective Magee knew that Harris lacked the mental capacity to understand or waive his rights. Rather, the clear import of the evidence is that Detective Magee understood that Harris did in fact comprehend his rights, and that Harris' waiver of those rights was made knowingly, voluntarily, and intelligently. There is nothing here that indicates that the police were taking advantage of Harris, nor anything at all "that smacks of abusive behavior." *Rice*, 148 F.3d at 750. For these reasons, petitioner's application for a writ of habeas corpus on the ground that he did not understand his *Miranda* warnings is DENIED.

### III. *Batson* Challenge

Petitioner, who is black, claims that the assistant district attorney impermissibly used his peremptory challenges to exclude fellow blacks from his jury. As a result, Harris claims that he was deprived of his constitutional rights under the Sixth and Fourteenth Amendments to the Constitution.

The facts relating to this claim have been set forth in the Jury Selection section, *supra*. To reiterate briefly, the first black venire person accepted on the jury was a Mr. McGruder. Following McGruder's disclosure that he had been convicted of a misdemeanor charge some twenty-five years earlier, but had failed to divulge the conviction to the court, the assistant district attorney sought to excuse McGruder for cause. The for-cause challenge was denied by the court, but the court permitted the prosecutor to remove McGruder peremptorily. V.D. 108–13. Later that

afternoon, the assistant district attorney excused two more potential black jurors with peremptory challenges. V.D. 121. Defense counsel promptly objected to their removal. Mr. Liotti stated: "Judge, I want the record to reflect that at this time Mr. Cotter has challenged the two black jurors that we had sitting the jury box, in addition to Mr. McGruder, okay, and both of those jurors I found to be acceptable. I think this is a purposeful attempt by Mr. Cotter to exclude black jurors." V.D. 121–22.

The judge, apparently in an effort to speed the proceedings, responded: "To make it easier, I'll permit you to make a separate argument afterwards, okay?" V.D. 122. However, Mr. Cotter indicated that he wanted to be heard, and then responded: "I certainly would indicate just because Mr. Liotti finds certain jurors qualified, does not mean the People do. I have specific reasons why I excluded the jurors that I have." V.D. 122–23. The court issued no ruling at that time, nor did the court make any comment about the situation brought to its attention, but instead proceeded with jury selection. V.D. 123.

The next time the court asked for peremptory challenges, Mr. Liotti appeared once again to attempt to raise an issue regarding the prosecutor's exercise of peremptory challenges. V.D. 160. Unfortunately, the record is not entirely clear what the issue was at that time, because the prosecutor interrupted Mr. Liotti by asking "Can we do this after?". V.D. 160. The court, in a response similar to that given previously, replied "We'll do this after." V.D. 160.

At the end of jury selection, five black venire persons, including McGruder, had been peremptorily challenged by the prosecutor and subsequently removed from the panel. V.D. 241–49. Neither the judge nor the assistant district attorney disagreed with the fact that five black venire persons had been excused by the assistant district attorney's use of peremptory challenges. *See id.; see also* Respondent's Brief to the Appellate Division, Second Department at 27–28, 38–39. And nobody disputed the fact that these five challenges resulted in the entire array of black venire persons being excused, such that the remaining jurors who heard the case, including alternates, were all white. V.D. 242.

Given the fact that *McCray* recently had been decided by the Second Circuit, and *Batson* was still more than a year away from being decided, the trial court's response to the defense applications regarding the use of the prosecutor's peremptory challenges was not surprising, nor can it be disparaged. The judge responded to the defense applications by stating: "Now, I'm troubled by what you stated because it seems to me that Mr. McGruder was a black man on Wednesday and on Thursday, but he was the same black man that he had accepted on Wednesday. Now, how could you argue that there is a systematic attempt to exclude blacks by the District Attorney's office of Nassau County when we had here, which was proof positive of the fact that the prosecutor had accepted a black man on Wednesday?" V.D. 244–245. The judge stated that he did not see the argument. V.D. 245.

Mr. Liotti pointed out that, even assuming that McGruder properly was excused for a legitimate, non-discriminatory reason, there were four other peremptory challenges that had been exercised against black venire persons. V.D. 245. Mr. Liotti then asked for the court to have Mr. Cotter state on the record his reasons for excusing the black venire persons, or perhaps to produce his notes and records on voir dire with respect to those prospective jurors. V.D. 246. Mr. Liotti also suggested, in accordance with *McCray*, that the court conduct a hearing on the matter, in order "[t]o see whether there was any purposeful or systematic exclusion of blacks from the jury." V.D. 246. In response, the court pointed out that the assistant district attorney had, in fact, allowed McGruder to be seated, stating that "at the present moment, I do have the

background of having had him [Mr. Cotter] select at least one black juror." V.D. 247.

Mr. Cotter again denied the allegations. He stated: "I deny any allegation that Mr. Liotti makes. I think Mr. Liotti is the only one who has interjected race into this voir dire." V.D. 247. He further opined that "Mr. Liotti's request for a hearing and for an analysis of my notes is frivolous and in poor taste." V.D. 248. Shortly thereafter, the court denied the defense request for a hearing. V.D. 249.

In April 1986, the Supreme Court ruled in *Batson* that the Equal Protection Clause of the Fourteenth Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race." *Batson*, 476 U.S. at 89, 106 S.Ct. 1712. The Court set forth the evidentiary standards necessary to determine whether or not a prosecutor's use of peremptory challenges constitutes "purposeful discrimination." *Id.* at 93, 106 S.Ct. 1712. The Court noted that this determination requires a court to "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " *Id.* (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). The Court expressly stated that peremptory challenges that have a disproportionate impact on a particular race may provide circumstantial evidence of invidious intent. *Id.* "For example, total or seriously disproportionate exclusion of Negroes from jury venires is itself such an unequal application of the law as to show intentional discrimination." *Id.* (internal citations, quotations, and ellipses omitted).

■ The evidentiary burden is as follows. First, a defendant may establish a prima facie case of intentional discrimination based entirely on evidence from the prosecutor's use of peremptory challenges at trial. *Id.* at 96, 106 S.Ct. 1712. "To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* A pattern of peremptory strikes against those prospective jurors who are of the defendant's race may suffice to raise an inference of impermissible intentional discrimination. *Id.*

■ Then, "[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forth with a neutral explanation for challenging black jurors." *Id.* at 97, 106 S.Ct. 1712. The proffer of this legitimate, non-discriminatory reason need not be as detailed or as thorough as that required to justify a for-cause challenge. *Id.* However, a prosecutor may not use as explanation for the peremptory challenges (1) the general belief that such persons would be partial to a defendant of their own race; (2) the belief that members of that particular race are not qualified for jury service; or (3) the prosecutor's denial of a discriminatory motive or a claim of good faith in the exercise of the challenges. *Id.* at 97–98, 106 S.Ct. 1712. The prosecutor must, however, "articulate a neutral explanation related to the particular case to be tried." *Id.* Having considered the direct and circumstantial proof of discrimination, and the prosecutor's neutral explanation for the exercise of particular challenges, the trial court then must make a determination whether the defendant has established purposeful discrimination. *Id.* A trial court's findings, on direct review as in *Batson*, and especially on habeas review, *see* 28 U.S.C. § 2254(e)(1), must be given great deference. *Id.* & n. 21, 106 S.Ct. 1712. As noted previously, these principles were extended retroactively to all cases, state or federal, that were pending or not yet final as of the date *Batson* was decided, April 30, 1986. *Griffith*, 479 U.S. at 328, 107 S.Ct. 708.

■ Subsequent decisions have expanded *Batson*'s reach. *See, e.g., Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that a *Batson* claim is not precluded where defendant's race differs from that of excluded jurors). Moreover, a *Batson* error is a structural

trial error that cannot be evaluated for harmlessness. *Tankleff v. Senkowski*, 135 F.3d 235, 240 (2d Cir.1998).

■ In this case, the Court holds that Petitioner made out a prima facie showing of racial discrimination resulting from the prosecutor's pattern of peremptory strikes. The evidence is clear that five black venire persons were challenged peremptorily by the prosecutor and removed from the jury panel. These five blacks constituted the entire array of black prospective jurors. This evidence was sufficient to make out a prima facie showing of intentional discrimination. *See Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir.2000) (assuming without deciding that the prosecutor's actions in peremptorily striking three black prospective jurors constituted a prima facie case of purposeful discrimination); *Tankleff*, 135 F.3d at 249 ("the fact that the [prosecution] tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case."); *see also id.* (citing cases).

Having decided that Petitioner established a prima facie case, the burden shifted to the prosecution to offer a race-neutral explanation for the use of its peremptory challenges. *See Batson*, 476 U.S. at 97–98, 106 S.Ct. 1712; *Jordan*, 206 F.3d at 200; *Tankleff*, 135 F.3d at 249. However, the trial court's actions in this case precluded the development of a full record on this issue, and prevented any meaningful determination whether the peremptory challenges exercised by the prosecutor were intentionally discriminatory.

■■ When defense counsel asked for a hearing, the application was denied. The prosecutor simply responded that the request was "frivolous and in poor taste." V.D. 248. While the prosecutor denied any systematic exclusion of black jurors, he failed to offer any race neutral reasons

for striking the five black potential jurors. The trial court did not complete the second or third steps required for a proper analysis of a *Batson* challenge. *Batson* 476 U.S. at 96–98, 106 S.Ct. 1712. The trial court did not develop the record, and failed to give defense counsel's application the time and weight it should have been accorded. Since the prosecutor did not come forth with a race neutral explanation for striking these five black potential jurors, the trial court could not make a determination whether the defendant carried his burden of proving purposeful discrimination. These missed steps were especially critical since the trial court's duty of assessing the credibility of the prosecutor's race-neutral reasons embodies the decisive question in a *Batson* analysis. *Hernandez v. New York*, 500 U.S. 352, 364–65, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

The Court recognizes that the trial court's actions, occurring pre-*Batson*, were not necessarily inappropriate given the state of the then-existing law. However, *Batson* clearly was the law during Harris' direct appeal, and the error was not remedied by the Appellate Division, Second Department.[4] Together, the state courts' actions resulted in a decision that was contrary to the clearly established law of the United States as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Therefore, having determined that Petitioner raised a prima facie of purposeful discrimination relating to the prosecutor's use of peremptory challenges; that the trial court failed to conduct the necessary inquiries; and that the appellate court failed to correct the federal constitutional error on direct appeal, the Court GRANTS Petitioner' application for a writ of habeas corpus.

Having decided that the writ must be granted, the Court must determine the appropriate remedy. Recent decisions

4. In fact, on direct appeal the Respondent requested that if the appellate court found that *Batson* had been violated, a hearing should be held to carry out the final two steps of the *Batson* inquiry. *See* Respondent's Brief to the Appellate Division, Second Department, at 35–39.

from the Second Circuit indicate that there are at least three possibilities to consider.

First, this Court may hold a reconstruction hearing and take evidence regarding the circumstances surrounding the prosecutor's use of the peremptory challenges to the five excluded black jurors. *See Jordan*, 206 F.3d at 202; *Tankleff*, 135 F.3d at 250. The Second Circuit has held that the district court is "not foreclosed from making the necessary determination as to the prosecutor's state of mind." *Brown v. Kelly* 973 F.2d 116, 121 (2d Cir.1992).

The second alternative is "to return the case to the state trial court on a conditional writ of habeas corpus so that the state court could conduct the inquiry on its own." *Tankleff*, 135 F.3d at 250 (citing *Howard v. Senkowski*, 986 F.2d 24, 30 (2d Cir.1993)). This option recognizes the principles embodied in the habeas corpus statute's exhaustion requirement, that state courts ordinarily should have the first chance to remedy constitutional violations. *Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

The third option available to the Court arises from the practical considerations of the length of time that typically has passed between jury selection and the court's decision on a habeas corpus petition. The Second Circuit has recognized that "there are cases where the passage of time may impair a trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected. Where such exists, there must be a new trial." *Brown*, 973 F.2d at 121. This possibility was noted expressly in *Tankleff*, where eight years had passed between trial and the grant of habeas relief. "Should the district court conclude, however, that the passage of time has made such a reconstruction hearing in either state or federal court unproductive, the court must then rule that defendant is entitled to a new trial." *Tankleff*, 135 F.3d at 250. The same situation arose in *Jordan*. "[I]f the passage of nine years since Jordan's trial and other circumstances should have made such a determination impossible or unsatisfactory, [the court must] order that the state grant Jordan a new trial." *Jordan*, 206 F.3d at 202. The decision to hold a reconstruction hearing, whether in state or federal court, or to order a new trial because of the passage of time and other circumstances, is firmly within the discretion of the district court. *See Jordan*, 206 F.3d at 202; *Tankleff*, 135 F.3d at 250.

In this case, more than fifteen and a half years have passed since Harris' trial. This period far exceeds the eight and nine year periods that concerned the Second Circuit in *Tankleff* and *Jordan*, respectively. In the last fifteen years, the persons involved in Harris' jury selection likely have moved on to other phases and stations in life, and their minds likely have been filled with other matters, far removed from the events of January 1985. In fact, the Court takes judicial notice of the fact that Judge Ain has retired from the bench, and Daniel Cotter, then an assistant district attorney, is now himself a judge of the Nassau County Court. Under the circumstances, fifteen years is a very long time. A hearing at this juncture would be akin to an attempt to repair a broken cobweb.

The Court, in its discretion, therefore determines that a reconstruction hearing at this date would be a practical impossibility, and its results would be wholly unsatisfactory. For this reason, the Court orders that the state must grant Harris a new trial on indictment 57785.

### III. Competency Claims

Petitioner also claims that his convictions unlawfully were obtained because he was not competent to stand trial under indictment number 57785, nor was he competent to plead guilty to a charge in indictment number 59972. Respondent concedes that the claim is exhausted as to both convictions. Respondent's Memorandum of Law, at 17 & n. 6. Accordingly, the Court examines the merits of Petitioner's claim with respect to both the trial and the guilty plea, both of which took place after

the shooting that caused Petitioner's head injury.[5]

■ "No one questions the existence of the fundamental right that petitioner invokes." *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). The Supreme Court "repeatedly and consistently [has] recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)). Moreover, there is no doubt about the test for determining competence. "A defendant may not be put to trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." *Cooper*, 517 U.S. at 354, 116 S.Ct. 1373 (citations, quotations and ellipses omitted); *see also Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (same); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (stating that the conviction of a legally incompetent person violates due process).

■ A necessary part of this fundamental right is that due process may be offended by a trial court's failure to order a psychiatric or psychological examination when a defendant's competence is called into doubt. *See Pate*, 383 U.S. at 385, 86 S.Ct. 836 (holding that trial court's failure to order a competency hearing deprived defendant of right to fair trial); *Drope*, 420 U.S. at 180, 95 S.Ct. 896 (same). In short, a trial court's failure to hold a competency hearing or to order a psychological examination when the evidence before the court warrants one is unconstitutional, depriving the defendant of his fundamental right to a fair trial and rendering the conviction invalid. *Nicks v. United States*, 955 F.2d 161, 167 (2d Cir.1992).

But at what evidentiary threshold does the evidence warrant a psychiatric examination or a competency hearing? *See id.*

at 168, 955 F.2d 161 (holding that the court must order a hearing "when warranted by the evidence."). This question is the crux of the inquiry, especially in a case such as this one, where the trial court made few observations regarding Harris' competency; and where the comments that the trial judge did make do not comfortably comport with the record evidence. Additionally, the question whether to order a psychiatric evaluation is inherently subjective, given that prudent jurists may have reasonable disagreements about the import of a defendant's appearance and behavior. The question is made more complex by the fact that on habeas review, the state court's findings of fact, if any, are presumed correct. 28 U.S.C. § 2254(e)(1).

Despite the complexity of the issues, the Supreme Court has indicated that protection of due process should be paramount. For example, in deciding in favor of the defendant in *Cooper*, the Supreme Court stated that "[b]y comparison to the defendant's interest, the injury to the State of the opposite error—a conclusion that the defendant is incompetent when he is in fact malingering—is modest." *Cooper*, 517 U.S. at 365, 116 S.Ct. 1373. The Court continued:

> To be sure, such an error imposes an expense on the state treasury and frustrates the State's interest in the prompt disposition of criminal charges. But the error is subject to correction in a subsequent proceeding and the State may detain the incompetent defendant for 'the reasonable period of time necessary to determine whether there is a substantial probability that he will attain [competence] in the foreseeable future.' *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).... [Moreover,] we presume ... that it is unusual for even the most artful malingerer to feign incompetence successfully for a period of time while under professional care.

---

**5.** Petitioner's trial on indictment number 57785 commenced on January 7, 1985. The

guilty plea on indictment 59972 was entered on April 25, 1985.

*Id.* (internal citations and footnotes omitted) (alterations in original).

 Despite the difficulties, the ultimate issue is "whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial." *Drope,* 420 U.S. at 174–75, 95 S.Ct. 896; *see also Nicks,* 955 F.2d at 169. In making this inquiry, the Supreme Court has held that it is the duty of the federal court "to analyze the facts in order that the appropriate enforcement of the federal right may be assured." *Drope,* 420 U.S. at 175, 95 S.Ct. 896 (quotation marks and citation omitted).[6] In making this determination, this Court may consider "only the evidence before the [trial] court at the time its decision was made." *Nicks,* 955 F.2d at 168.

 Evidence of a defendant's behavior and demeanor is highly relevant. *Drope,* 420 U.S. at 180, 95 S.Ct. 896; *Pate,* 383 U.S. at 385, 86 S.Ct. 836. The opinion of defense counsel also is an important factor to consider. *Johnson v. Keane,* 974 F.Supp. 225, 230 (S.D.N.Y.1997). Nevertheless, there are no "fixed or immutable signs" that a court should look for because "a wide range of manifestations and subtle nuances are implicated." *Drope,* 420 U.S. at 180, 95 S.Ct. 896. "That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts." *Id.*

In this case, trained psychiatrists were never given the chance to evaluate Harris following the injury to his head and brain. Moreover, the trial court never addressed the federal constitutional aspect of the issue of Harris' competency, but rather its considerations were based on Section 730.30 of the New York Law Criminal Procedure Law. Under New York law, an incapacitated person is one "who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense." N.Y. C.P.L. § 730.10. Furthermore, § 730.30 provides that "the court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person." In other words, a trial judge must order a hearing when there is a "reasonable ground" for believing that the defendant is not fit to stand trial. *Silverstein v. Henderson,* 706 F.2d 361, 367–69 (2d. Cir.1983) (directing issuance of a writ of habeas corpus and discussing N.Y. C.P.L. § 730 .30); *see also Pate,* 383 U.S. at 385–86, 86 S.Ct. 836; *United States v. Nichols,* 56 F.3d 403, 414 (2d Cir.1995) (holding that the Due Process Clause requires a hearing in instances where a court has "reasonable cause" to believe that the defendant is incompetent).

 Evidence of Harris' competency or lack thereof is somewhat limited, mainly because the trial court allowed little opportunity for defense counsel to raise and elaborate upon the issue. Nevertheless, the evidence that is available raises questions about Harris' competency that should have been explored.

On June 27 and July 16–18, 1984, the trial court held a hearing to determine the admissibility of Petitioner's confession. At this hearing, Dr. Feldman testified about Harris's mental capabilities with respect to his ability to comprehend *Miranda* warn-

---

6. Deference to the state courts' legal determinations arising from record facts is not required when considering an inquiry into a petitioner's mental condition under the Due Process Clause. " '[I]ssue of fact is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication. Especially in cases arising under the Due Process Clause it is important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits.' " *Drope,* 420 U.S. at 175 & n. 10, 95 S.Ct. 896 (quoting *Watts v. Indiana,* 338 U.S. 49, 51, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949)) (ellipses omitted).

ings. Dr. Feldman had examined Harris only twice, once in March 1984 and once in July 1984. He also had reviewed Harris' school records and his psychological records from the time Harris was nine years old until he was seventeen years old. This evidence is the only expert testimony available that gives any insight into Harris' competency or lack thereof.

Dr. Feldman testified that his first meeting with Harris, which lasted about an hour, was conducted to determine Harris' competence to stand trial. H.M. at 251–53. The second meeting was held to determine Harris' understanding of his *Miranda* rights. H.M. at 252. Dr. Feldman testified that both psychiatrically and legally there is a difference between competence to stand trial and competence to understand *Miranda* warnings. H.M. at 256. The doctor determined that Harris was competent to stand trial at the time the first examination was conducted, in March 1984. The expert testified that Harris "understood the nature of the charges. He understood the consequences if convicted. He understood the role of the prosecuting attorney, of the judge, of the jury, if there was a jury, and what would happen if he was found guilty. So, at that time my opinion was that he was competent to stand trial." H.M. at 257; *see also* H.M. at 279–80, 287.

Dr. Feldman also testified that Petitioner had "borderline intellectual functioning." H.M. at 258. He further testified that his rough clinical estimate was that Harris' IQ ranged between seventy and eighty, which is the range of intelligence between low-normal and mental retardation. H.M. at 275.

In addition to Petitioner's pre-existing mental deficiencies, Harris was shot in the head on September 21, 1984 during his attempt to escape from custody. On October 9, 1984, before Judge Ain had issued a ruling on Harris' motion to suppress his confession, Harris submitted a motion and an affidavit in support of motion for an examination pursuant to N.Y. C.P.L. § 730.30. *See* Respondent's Brief to the Appellate Division, Second Department, Appendix 3. Harris' counsel moved the court to order the examination based on Harris' concededly low IQ, combined with the fact that he had been shot in the head, the bullet having passed through the midline of the brain and having lodged in the ventricle. *See id.* Defense counsel's affirmation in support of the motion stated that as a result of his client's low IQ, the head wound, and the medication being administered to Harris, it was impossible to communicate with his client about the case. *Id.*

The People filed an affirmation in opposition to the motion for a § 730.30 examination on October 16, 1984. *See* Respondent's Brief to the Appellate Division, Second Department, Appendix 4. The assistant district attorney opposed the motion on two grounds. First, he contended that Harris, despite having been shot in the head, had "not lost any ability to communicate with [ ]his attorney." *Id.* Second, he contended that a § 730.30 examination would delay the prosecution of the case. *Id.* The People also suggested that instead of ordering an examination, the trial judge simply could examine Harris in court to determine for himself whether a § 730.30 examination was warranted. *Id.*

On October 17, 1984, Judge Ain heard oral argument on the motion. Mr. Liotti stated that "I have had difficulty communicating with my client in several respects. I would say that it is beyond my competence as a lawyer to decide whether this individual is competent to stand trial. For that reason, I would suggest to the Court that we have someone who is competent to make that determination." Respondent's Brief to the Appellate Division, Second Department, Appendix 5 (Minutes of Hearing of October 17, 1984), at 7–8. In response, Mr. Cotter argued that he did not see any new facts supporting a § 730.30 examination. Mr. Cotter complained that an examination would delay the proceedings for at least thirty days. He also asked the court to make its own

inquiry of Harris to determine if the facts supported a psychiatric examination. *Id.* at 8–9.

The trial judge then conducted a brief question and answer session with Harris. The colloquy was as follows:

The Court: Mr. Harris, I'm going to ask you some questions. Do you know what date today is?

Harris: What?

The Court: Do you know what day of the week it is?

Harris: Today?

The Court: What is it?

Harris: I don't know.

The Court: You know Mr. Liotti, don't you?

Harris: Yes.

The Court: He's your attorney?

Harris: Yes.

The Court: Have you spoken to Mr. Liotti recently?

Harris: No.

The Court: Pardon?

Harris: No.

The Court: When was the last time that you spoke to him? I'm not asking you what you discussed. All I want to know is if you've spoken to Mr. Liotti recently.

Harris: I don't remember.

Respondent's Brief to the Appellate Division, Second Department, Appendix 5, at 10–12. The court then stated: "All right, based upon the Court's observation in the questions that I've asked, I'm constrained to deny your motion." *Id.* at 12. No reason was given for the decision and no findings of fact were made.

The issue of Harris' ability to comprehend the proceedings and to assist in his own defense was marginally raised two other times during the remainder of the trial proceedings. On January 3, 1985, the second day of jury selection, the trial court ruled on the admissibility of Harris' prior convictions and arrests, in the event Harris chose to testify. V.D. at 63. In response to the People's application to be permitted to use this material at trial, Mr. Liotti stated to the court that

I have a defendant here, Judge, with, I think, your Honor said, you know, a modicum of intelligence. He has a 69 I.Q. He's very inarticulate, Judge. In addition to that, he has a bullet in his head at this moment in time. I tried to speak with him previously about these prior convictions. I've spoken to him a number of times about them and he just doesn't recall or recollect, and as in this past matter that I just raised a moment ago, his ability to communicate what transpired is sorely lacking.

V.D. 67–68. Judge Ain told counsel that he did not disagree with what he had said, and that he understood Harris' position. V.D. 68.

Later in the proceedings, defense counsel again told the court that Harris could not "elucidate or carry on a conversation to the extent he remembers anything about these prior acts." V.D. 232. The court expressed its opinion that Harris had participated with counsel in jury selection. V.D. 236. Mr. Liotti protested that there was no way the judge could hear the actual conversations between the two. V.D. 237. The judge responded that he could "see the interest that Mr. Harris expresses which I think is commendable." V.D. 237.

Mr. Liotti again protested, and told the court that both he and his paralegal were prepared to state for the record that Harris had offered "absolutely no assistance in jury selection because he's been unable to do so." V.D. 237. Mr. Liotti told the court that when he would ask his client about a particular juror, Harris "would utter forth a grunt or something of a reasonable facsimile which makes absolutely no comprehensible sense to me." V.D. 238. The court steered the conversation back to the *Sandoval* issue, but stated on the record that there was "no evidence to the contrary to indicate" that Harris could not participate, cooperate, and aid in his own defense. V.D. 238–39. Following this

exchange, the competency issue was not mentioned again at trial.[7]

Harris was sentenced for the convictions relating to indictment number 57785 on February 7, 1985. Although Mr. Liotti referred to Harris' mental deficiencies during sentencing, there was no argument raised as to Harris' competency at that time.

Two and a half months later, Harris pled guilty to attempted murder to satisfy the charges in indictment number 59972. The transcript of the Minutes of the Change of Plea, which took place on April 25, 1985, reveals that Harris had considerable difficulty understanding the proceedings. For example, after each question the judge asked, Harris had to confer with Mr. Liotti in order to answer. Although such consultation normally may be expected and required during the course of entering a guilty plea, Harris consulted his attorney about questions as simple as how old he was and how much schooling he had completed. Plea Minutes, at 3–4. However, when asked directly whether he understood the nature of the proceedings, Harris answered that he did. *Id.* at 5, 20, 22.

Throughout the course of the proceeding, the court was very careful to ensure that Harris understood the nature of the proceedings and the consequences of his guilty plea. *Id.* at 7. In fact, the record reflects that Harris had a complete understanding of the plea proceedings, and that his counsel was careful to concede that point without conceding Harris' appellate rights with regard to his competency to stand trial on the first indictment. *Id.* at 7–9.

This Court has no hesitancy in declaring that Petitioner was competent to enter the guilty plea to indictment number 59972. Although Harris encountered significant

difficulty understanding the questions asked of him, competency was conceded both by Harris and his counsel. *Id.* Moreover, several inquiries were made throughout the proceeding regarding Harris' understanding of what was transpiring, and Harris consistently responded that he understood the proceedings. *Id.* at 5–7, 20, 22. Therefore, Harris' application for a writ of habeas corpus on competency grounds as to the guilty plea is DENIED.

The Court has a much more difficult time, however, with the question of Harris' competency during the proceedings involving indictment number 57785. In particular, it is patently obvious that during the proceedings held on October 17, 1984, Harris' responsiveness and lack of understanding indicated his inability to comprehend the proceedings. For example, he did not know the day of the week, and he said he had not spoken recently to his attorney. Respondent's Brief to the Appellate Division, Second Department, Appendix 5, at 10–12. The cursory questioning of Harris conducted by the court was insufficient to ascertain whether Harris may have been mentally incapacitated at that time and thus incapable of proceeding toward trial. *See* N.Y. C.P.L. § 730.30 (noting that the trial court's initial inquiry is not whether the defendant is or is not incapacitated, but rather whether the defendant "may be" incapacitated). If the defendant "may be" incapacitated, the court "must issue an order of examination." *Id.; see also Henderson,* 706 F.2d at 369 (holding that trial court must order a hearing if "reasonable ground" exists for believing that a defendant may be incompetent to stand trial); *Johnson,* 974 F.Supp. at 238 (same).

Regardless of the state law issue, the question before this Court is whether, despite the trial court's failure to order the examination under § 730.30, a federal constitutional due process violation occurred.[8]

7. Petitioner argues, as he did on direct appeal, that his defense counsel made "repeated requests" for psychiatric evaluations to determine if he was competent to be on trial. Petitioner claims, however, that these requests were not recorded in the trial transcript. *See* Petitioner's Brief, at 52. However, the record is what it is, and the Court may

not speculate about what may or may not have occurred outside its four corners.

8. The failure to order the § 730.30 examination, if error, would have been solely an error of state law—an issue not subject to review by this Court. *See Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)

That is, did the trial court's failure to make sufficient inquiry into Harris' mental condition on October 17, 1984 deny him a fair trial? *See Drope*, 420 U.S. at 174–75, 95 S.Ct. 896. Although the inquiry is extraordinarily difficult, the Court is of the view that Harris' uncontested lack of mental acuity, combined with the severe head injury suffered less than a month earlier, were sufficient to raise a serious constitutional question regarding Harris' ability— at that moment in time—to consult with his lawyer and to have a rational and factual understanding of the proceeding. *See Cooper*, 517 U.S. at 354, 116 S.Ct. 1373.

The Supreme Court has advised that "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 182, 95 S.Ct. 896; *see also United States v. Mason*, 52 F.3d 1286, 1292–1293 (4th Cir.1995) (holding that even if a defendant appears competent during one phase of the proceedings, a court must be alert to subsequent evidence suggesting incompetence); *Johnson*, 974 F.Supp. at 231 ("holding one competency hearing at the beginning of the proceedings may not satisfy the constitutional requirement that courts [must] establish that the defendant is fit to stand trial."). In sum, "[t]he refusal to hold a competency hearing when the evidence suggests that such a hearing is necessary is a violation ... of the Due Process Clause." *Johnson*, 974 F.Supp. at 230.

As a result, the Court holds that the circumstances before the trial court in October 1984 presented a reasonable ground for believing that Harris was, at that moment, incompetent to stand trial. *See Silverstein*, 706 F.2d at 369. Petitioner's mental deficiencies were never disputed by the People, nor did the People contest the fact that Petitioner had been shot in the head and was still recovering from that wound, nor the fact that Harris was taking medication at the time to assist his recovery. Moreover, defense counsel's statements that he could not communicate with Harris gave increased urgency to the issue, as did the bizarre responses given by Petitioner to the court during the hearing on the motion.

Together, this evidence entitled Harris to a psychiatric examination and a hearing as to his competency to proceed toward trial. *See Pate*, 383 U.S. at 385, 86 S.Ct. 836. Granted, it may have turned out that Harris was not, in fact, incompetent at that time, and the case simply could have proceeded accordingly. Although the examination may have delayed the trial to the dismay of the trial court and the assistant district attorney, the "correct course was to suspend the [proceedings] until such an evaluation could be made." *Drope*, 420 U.S. at 181, 95 S.Ct. 896; *see also Nicks*, 955 F.2d at 168 ("[t]here exists an affirmative obligation on the part of the trial court to order a competency hearing when warranted by the evidence.").

 Despite having determined that Harris' due process rights would and should have been better protected by a competency hearing or psychiatric examination in October 1984, the Court cannot ignore that the actual trial of this matter did not take place until some two and a half months later. Nor can the Court ignore the absence of any subsequent arguments or applications *at trial* regarding Harris' mental state. Without any evidence to the contrary, and without any application or motion having been made on the record, the Court must presume that Harris was *not* incapacitated at the time of trial in January 1985. It is logical to presume that Harris' condition—as far as the bullet wound—had improved between October 17, 1984 and January 2, 1985 when voir dire began. To the extent that Harris' medication was causing some or all of his difficulties in October, it is likely that the medication had been reduced or elimi-

(stressing that when conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

nated entirely by January 1985. Thus, despite the fact that the trial court should have ordered an examination in October 1984, the Court cannot say that the failure to do so deprived Harris of his constitutional right to a fair trial two and a half months later.

 The case law reveals that incapacity or incompetence to stand trial can come and go. "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181, 95 S.Ct. 896; *see also Johnson*, 974 F.Supp. at 240 (discussing cases). The proposition that a defendant may be competent at one point and incompetent at a later point is equally valid in reverse. That is, a defendant may be incompetent at one point but competent later on, which may have been the case here.

More importantly, the proper focus is on the Petitioner's competence *at trial. See Cooper*, 517 U.S. at 354, 116 S.Ct. 1373 ("the criminal *trial* of an incompetent defendant violates due process") (emphasis added); *Drope*, 420 U.S. at 181, 95 S.Ct. 896 (repeating that the issue is a defendant's competence "to stand *trial* ") (emphasis added); *Pate*, 383 U.S. at 378, 86 S.Ct. 836 ("the *conviction* of an accused person while he is legally incompetent violates due process") (emphasis added); *Silverstein*, 706 F.2d at 369 (noting that the question is whether a defendant is "incompetent to stand *trial* ") (emphasis added); *Johnson*, 974 F.Supp. at 229 ("[s]ubjecting an incompetent person to *trial* is a violation of that person's constitutional right to due process") (emphasis added); *but see Pate*, 383 U.S at 386, 86 S.Ct. 836 (holding that petitioner's constitutional rights were violated "by his failure to receive an adequate *hearing* on his competence to stand trial") (emphasis added); *Nicks*, 955 F.2d at 167 (holding that "[t]he failure to hold a competency *hearing* when constitutionally required is an error") (emphasis added).

Accordingly, the Court holds that while Petitioner should have received a competency examination in October 1984 when the evidence strongly suggested his inability to comprehend the proceedings, there is scant evidence in the trial record to suggest his competency was sufficiently in doubt at the time of his trial. Granted, this holding requires a degree of hairsplitting. But the fact of the matter is that while evidence of Harris' lack of competency appears in the record as of October 1984, there is no such evidence appearing in the trial transcript. For this reason, Harris' petition for a writ of habeas corpus on the ground of incompetency to stand trial on indictment number 57785 is DENIED.

Nevertheless, should the State decide to re-try Harris on the charges contained in indictment number 57785 as a result of this Court's holding on the *Batson* claim, *supra*, the State must ensure that Harris is competent to stand trial at the time he is retried.

## IV. Unconstitutional Sentence Claim

 Harris claims that the sentence imposed by the trial court was unconstitutionally excessive. However, the sentences imposed were within the statutory range for the sentencing of a second felony offender. *See* N.Y. Penal Law § 70.06. Accordingly, Petitioner's claim on this issue is without merit because "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992). This claim is therefore DENIED.

## *CONCLUSION*

For the reasons discussed above, Petitioner's application for a writ of habeas corpus is GRANTED on the *Batson* claim as to indictment number 57785. This conclusion means, of course, that Harris' conviction under this indictment is vacated.

**348**

The conviction under indictment 59972 remains.

However, Petitioner was sentenced under indictment 59972 to "an indeterminate term of imprisonment with a minimum term of seven and a half years and a maximum term of 15 years." Minutes of Sentence, May 15, 1985, at 4. This sentence was to run consecutively with the sentence imposed under indictment 57785, which has now been vacated.

As noted previously, both convictions occurred over fifteen years ago. With the first conviction having been vacated, this means that Harris already has served the maximum term of fifteen years imposed under indictment 59972.

For these reasons, Respondent is ORDERED to release Harris unless he is retried within sixty days on indictment number 57785.

In the event that either party seeks to appeal this decision, the Court shall issue a Certificate of Appealability to Petitioner to allow him to cross-appeal on the *Miranda* claim and the competency claim because he has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner has demonstrated that the resolution of these claims are debatable and could be resolved differently on appeal. *See Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

SO ORDERED.