Curtis **HARRIS**, Petitioner–Appellee–Cross-Appellant,

v.

Robert **KUHLMANN**, Superintendent, Sullivan Correctional Facility, Respondent–Appellant–Cross-Appellee,

Nos. 00–2740, 01–2139.

United States Court of Appeals, Second Circuit.

Argued: Feb. 13, 2003.

Decided: Oct. 10, 2003.

Brian Sheppard, New Hyde Park, NY, for Petitioner–Appellee–Cross–Appellant.

Margaret E. Mainusch, Assistant District Attorney (Denis Dillon, District Attorney, on the brief, Peter A. Weinstein, Tammy J. Smiley, Assistant District Attorneys, of counsel), Nassau County, Mineola, NY, for Respondent–Appellant–Cross–Appellee.

Before: VAN GRAAFEILAND, CABRANES, and F.I. PARKER, Circuit Judges.

F.I. PARKER,* Circuit Judge.

Respondent-appellant-cross-appellee Robert Kuhlmann, Superintendent of the Sullivan Correctional Facility, appeals from that portion of the October 17, 2000 judgment of the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge*) which granted petitioner-appellee-cross-appellant Curtis Harris's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, vacated Harris's state conviction for two counts of murder and other related crimes, and directed that Harris be released unless the State of New York retried him within sixty days. The District Court granted Harris's petition after finding that Harris's· Fourteenth Amendment rights were violated by the state prosecutor's use of peremptory strikes in a racially discriminatory manner. *See Harris v. Kuhlmann,* 115 F.Supp.2d 326, 328, 336–38 (E.D.N.Y.2000) (relying on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). Kuhlmann also appeals from that portion of the District Court's November 28, 2000 order which denied his motion for reconsideration of the court's judgment granting the writ, or, in the alternative, reconsideration of the court's judgment granting Harris a new trial, rather than a hearing on the reasons why the prosecutor peremptorily struck the jurors that he did.

Harris filed a cross-appeal, challenging: (1) that portion of the District Court's October 17, 2000 judgment which denied

the part of his habeas petition that was based on the contention that his constitutional right to present a defense was violated when the state trial court failed to hold a competency hearing despite evidence that Harris was incompetent at the time of his trial; and (2) the District Court's May 6, 2002 order denying Harris's motion for reconsideration.

For the reasons set forth herein, we conclude that the District Court correctly concluded that the state court's denial of Harris's *Batson* claim was inappropriate under federal law, but that the District Court erred by ordering that Harris be granted a new trial without first conducting a reconstruction hearing to determine, if possible, whether the state prosecutor had valid reasons for using his peremptory strikes as he did. With respect to the issues Harris raised in his cross-appeal, we find no error in the District Court's rulings.

## BACKGROUND

On January 10, 1985, a jury in Nassau County Court found Harris guilty of one count of intentional murder, two counts of felony murder, one count of burglary in the first degree, and one count of robbery, as a result of an incident in which Harris and another man, Julio Giano, robbed and killed Giano's former girlfriend, Vicki Kestoglou. Harris was sentenced to an indeterminate term of twenty-five years to life on each of the three murder counts, and twelve-and-one-half to twenty-five years on each of the burglary and robbery counts.

Harris's habeas petition challenges two aspects of the proceedings in the state courts: (1) the trial court's failure to order a competence hearing after Harris was shot in the head; and (2) the prosecutor's

---

* The Honorable Fred I. Parker died on August 12, 2003. Prior to his death he fully participated in the consideration and decision of this case and prepared this opinion.

use of peremptory strikes. Therefore, in order to evaluate the merits of Harris's habeas petition, it is first necessary to recount certain portions of the proceedings below.

## I. Harris's Motion to Suppress

In June and July of 1984, the state trial court conducted a hearing on Harris's motion seeking suppression of oral, written, and videotaped statements Harris made to the police. Harris argued that the statements should be suppressed because his waiver of his right to an attorney was involuntary due to his low intelligence (and consequent inability to understand parts of the *Miranda* warnings he was given).

In support of this motion, Harris presented testimony from Dr. Roger P. Feldman, a psychiatrist. Dr. Feldman examined Harris for an hour in March 1984 and for a half hour in July 1984. Resp't–Appellant–Cross–Appellee's App. at 382 (hereafter "App."). The first examination focused on Harris's "competence to stand trial and whether [Dr. Feldman] felt there was any indication for insanity at the time of the alleged crime." *Id.* at 252. "The second examination [focused] on [Harris's] understanding of his Miranda rights, specifically ...." *Id.* During the course of these examinations, Dr. Feldman observed and spoke to Harris but did not conduct any formal diagnostic testing. *Id.* at 251–52. Dr. Feldman also reviewed Harris's school records from the time Harris was nine years old until he dropped out of high school. *Id.* at 249. Dr. Feldman did not review any records from the time period after Harris dropped out of high school, despite the fact that he was aware that Harris had been enrolled in various educational programs during that period. *Id.* at 288.

Dr. Feldman testified that Harris had "borderline intellectual functioning," which is "not considered a mental retardation diagnosis." *Id.* at 381. Instead, "[i]t's considered somewhere in between normal and in between [sic] retarded, so that any individual with low-borderline intellectual functioning, even though their IQ may be between 75 and 80, still have [sic] the ability to function in life adequately." *Id.* Dr. Feldman opined, based on his conclusion that Harris was in the "borderline intellectual functioning" category, that Harris's IQ was in the range between seventy and eighty. *Id.* at 259–60. Dr. Feldman noted that, though he did not rely on the Hartford school department records in making his assessments, those records were consistent with his conclusion about Harris's I.Q. *Id.*

Dr. Feldman concluded that Harris was competent to stand trial in March 1984 because Harris understood at that time: (1) "the nature of the charges"; (2) "the consequences if convicted"; and (3) "the role of the prosecuting attorney, of the judge, of the jury, if there was a jury, and what would happen if he was found guilty." *Id.* at 257. However, Dr. Feldman had the impression that, at the time of his confession, Harris did not understand that he was entitled to speak with an attorney before speaking to the police. *Id.* at 256.

On cross examination, the prosecutor challenged the validity of and the sufficiency of the evidentiary basis for a number of Dr. Feldman's conclusions. For example, on cross-examination Dr. Feldman acknowledged that he was aware that Harris "attended ... rehabilitative programs [and] educational programs" in some of the institutions he was in after he dropped out of high school, and that he knew that Harris's intellectual functioning had improved as a result of the training Harris had received since age seventeen. *Id.* at 288, 388. Nonetheless, Dr. Feldman did

not attempt to obtain any records from any of those programs. *Id.* at 388.

The prosecutor also pointed out on cross-examination that Dr. Feldman initially classified Harris as being in the "low-normal" intellectual functioning category, which is the category above the "borderline intellectual functioning" category. *Id.* at 383, 386. Only after the second interview, when Harris's ability to understand the *Miranda* warnings was the focus, did Dr. Feldman's assessment of Harris's intellectual capability drop from "low-normal" to "borderline intellectual functioning." However, as Dr. Feldman pointed out, between the first and second interviews Dr. Feldman had received Harris's Hartford school records, which indicated that Harris had "severe learning disabilities." *See id.* at 387–88.

Finally, the prosecutor raised the possibility that Harris was malingering when Dr. Feldman interviewed him. *Id.* at 280. Although Dr. Feldman testified that he did not believe that Harris was malingering, he conceded that he had not conducted any tests to determine the accuracy of the information Harris provided. *Id.* at 280–81. Moreover, Dr. Feldman testified that the issue of Harris's understanding of the *Miranda* warnings did not come up until the second interview, at which time, according to Dr. Feldman: (1) Harris had discussed with his attorney in detail the meaning of the *Miranda* rights, *id.* at 254; (2) Harris had been "researching or reading law books on this particular topic," *id.* at 287; and (3) Harris understood that it was in his best interest to have his statements to the police suppressed, *id.*

## II. Harris's Motion Seeking a Mental Competence Examination

On September 21, 1984, before the trial court ruled on Harris's motion to suppress, Harris and Giano escaped from the custody of a court officer at the County Courthouse in Mineola, New York. During the ensuing shootout, Harris shot a court officer in the head.[1] Harris himself was also shot in the head. The bullet, which has never been removed, passed through the midline of his skull and lodged in the central ventricle of his brain.

In October 1984, Harris filed a motion seeking a competence examination pursuant to N.Y.Crim. Proc. Law § 730.30 (McKinney.1995).[2] In support of this motion, Harris's counsel filed an affirmation in which he stated that it was impossible to communicate with Harris about the case due to the combined effects of Harris's low IQ, Harris's head injury, and the medication Harris was taking in treatment of his head wound. Harris's attorney did not submit any medical documentation about the effect of Harris's injury on his mental capacity, a list of medications Harris was taking, or any other evidence in support of this motion.

---

1. Harris later pleaded guilty to attempted murder in the second degree for his role in that incident, and was sentenced to seven-and-one-half to fifteen years, to be served consecutively to the sentence imposed in the instant case. In the District Court, Harris argued that the state trial court erred by failing to hold a competency hearing before accepting Harris's guilty plea for the charges stemming from the attempted escape. The District Court rejected that argument, *see Harris v. Kuhlmann,* 115 F.Supp.2d 326, 345 (E.D.N.Y.2000), and Harris has not challenged that decision on appeal.

2. Section 730.30 requires a court to "issue an order of examination when it is of the opinion that the defendant may be an incapacitated person." N.Y.Crim. Proc. Law § 730.10 defines an incapacitated person as one "who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense."

On October 17, 1984, the state trial court heard oral argument on the motion. In support of the motion, Harris's counsel stated:

[I]t's my understanding from the physicians treating my client that a bullet is lodged in the ventricle of his brain. Accordingly, I have had difficulty communicating with my client in several respects. I would say that it is beyond my competence as a lawyer to decide whether this individual is competent to stand trial. For that reason, I would suggest to the Court that we have someone who is competent to [sic] make that determination.

App. 425–26. In response, the prosecutor argued that there was insufficient evidence to warrant a section 730.30 examination. *Id.* at 426. As evidence of Harris's competence, the prosecutor stated that: (1) Harris had been released from the hospital and returned to the jail; and (2) jail personnel with whom the prosecutor had spoken that morning reported that "[t]hey have no problem in communicating with [Harris] and have made no noticeable observation of any inability to communicate at this time." *Id.* The prosecutor then suggested that the judge should "inquire of the defendant at this time as to whether there are any facts that would warrant [a hearing]." *Id.* at 426–27. The trial judge then asked the prosecutor, "How do you respond to [Harris's counsel's] oral argument that irrespective of the fact that none of the personnel that you've described have difficulty in communicating with the defendant Harris that he[, Harris's counsel,] has difficulty communicating with [Harris] . . . ?" *Id.* at 427. The prosecutor noted that, even though he was "not privy to the conversation," he "did observe [Harris's counsel] conversing with his client in the courtroom." *Id.*

The judge proposed that he himself question Harris to determine whether a section 730.30 hearing was required. Harris's counsel objected on Fifth Amendment grounds to any such questioning. *Id.* at 428. However, the judge overruled that objection and conducted a brief question-and-answer session with Harris. The colloquy was as follows:

[The Court]: Mr. Harris, I'm going to ask you some questions. Do you know what date today is?

[Harris]: What?

[The Court]: Do you know what day of the week it is?

[Harris]: Today?

[The Court]: What is it?

[Harris]: I don't know.

[The Court]: You know Mr. Liotti, don't you?

[Harris]: Yes.

[The Court]: He's your attorney?

[Harris]: Yes.

[The Court]: Have you spoken to Mr. Liotti recently?

[Harris]: No.

[The Court]: Pardon?

[Harris]: No.

[The Court]: When was the last time that you spoke to him? I'm not asking you what you discussed. All I want to know is if you've spoken to Mr. Liotti recently.

[Harris]: I don't remember.

*Id.* at 429–30. The trial judge then stated: "All right, based upon the Court's observation in the questions that I've asked, I'm constrained to deny" the motion seeking a section 730.30 examination.

## III. The Trial Court Denied Harris's Motion To Suppress

On December 4, 1984, the trial court denied Harris's motion to suppress state-

ments he made to law enforcement officials. In support of its ruling, the court made a number of findings and observations with respect to Harris's mental capacity at the time he initially spoke to the police. *Id.* at 437, 440–42.

First, the court found, as a matter of fact, that Harris's intelligence was in the "low normal range." *Id.* at 437. Next, the court concluded that Harris failed, as a matter of law, to "demonstrate through the testimony of Dr. Feldman that it was impossible, due to [Harris's] reduced level of intelligence, for [Harris] to comprehend the full meaning of the rights afforded to him . . . ." *Id.* at 441. In support of this conclusion, the court primarily relied upon the evidence that "Harris had been arrested on prior occasions and was familiar with his *Miranda* rights," and that Harris was informed of his rights on "several different occasions in the instant case." *Id.* The court also appears to have accepted, at least to some degree, the government's argument that Harris was malingering. *See id.* at 442 ("Finally, it is interesting to note, that the defendant did not raise to [Dr.] Feldman his confusion concerning his right to counsel until the second interview, at which point he had been studying this area of the law.").

## IV. Evidence Concerning Harris's Competence at the Time of Trial

Harris's ability to comprehend the proceedings and to assist in his own defense was raised again at trial, but not in the context of a request for a competence hearing. On January 3, 1985, the second day of jury selection, the court addressed the government's application, pursuant to *People v. Sandoval,* 34 N.Y.2d 371, 314 N.E.2d 413, 357 N.Y.S.2d 849 (1974), to be permitted to inquire into Harris's prior convictions and arrests in the event Harris chose to testify at trial. During the course

of the hearing on this motion, Harris's counsel questioned the accuracy and sufficiency of the government's records concerning Harris's prior convictions. The trial court noted that, under *Sandoval,* the defendant bears the burden of "inform[ing] the Court of prior convictions and misconduct which might unfairly affect him as a witness in his own behalf," and "demonstrating that the prejudicial effect of the admission of evidence thereof for impeachment purposes would so far outweigh the probative worth of such evidence on the issue of credibility as to warrant its exclusion." *Id.* at 512. In response, Harris's counsel stated:

> Well, I don't object to [the idea that Harris bears the burden of proof], Judge, except I would rely, you know, I have a defendant here, Judge, with, I think, your Honor said, you know, a modicum of intelligence. He has a 69 I.Q. He's very inarticulate, Judge. In addition to that, he has a bullet in his head at this moment in time. I tried to speak with him previously about these prior convictions. I've spoken to him a number of times about them and he just doesn't recall or recollect, and as in this past matter that I just raised a moment ago, his ability to communicate what transpired is sorely lacking.

*Id.* at 512–13. The trial court responded:

> I'm not suggesting that some of these circumstances are incorrect that you have asserted. I just don't have and haven't made a finding of any sort about the I.Q. situation because that does go back some years, that reference in the Hartford Public School system. But I understand your position . . . .

*Id.* at 513. Shortly thereafter, the trial court granted Harris's counsel a continuance with respect to the government's *Sandoval* motion, so that Harris's counsel could speak with Harris's family and oth-

erwise research Harris's prior convictions. *Id.* at 515–16.

The next day, at the end of jury selection, the trial judge took up the government's *Sandoval* motion again. During the course of the hearing, Harris's counsel repeatedly stated that neither Harris nor his parents were able to recall the details of most of Harris's prior convictions with enough specificity to allow Harris's counsel to challenge those convictions properly. *See, e.g., id.* at 677 ("I've tried to get information from this Defendant about his prior record and very honestly, your honor, the Defendant cannot elucidate or carry on a conversation to the extent that he remembers anything about these prior acts."); *id.* at 678 (noting that Harris confirmed "to some extent" the limited information that his mother was able to provide, but also noting that Harris "had a very substantial drinking and drug problem for many, many years").

Prior to rendering his decision, the trial judge observed:

> ... [N]otwithstanding the arguments advanced, I too have had an opportunity during the course of the various proceedings and indeed the proceeding today and yesterday and the day before and a very important aspect of the trial of any criminal action, I've had an opportunity not only to observe the fact that you [, Harris's trial counsel,] have done a fine job ..., but I have seen you work very hard for your client and I think from an observation standpoint, most ably for your client. I think he's participated with you in the jury selection.... [T]hat's my own observation
> ....

App. 680–81. Thereafter, the following exchange occurred between Harris's counsel and the trial judge:

> [Harris's counsel]: Judge, ... most respectfully I know you can't hear the

conversation that Mr. Harris and I are having—

THE COURT: But I can see facial expressions and I can see the interest that Mr. Harris expresses which I think is commendable.

[Harris's counsel]: You may recall, Judge, on the first day of jury selection we had a paralegal sitting between myself and Mr. Harris. She and I are both prepared to state for the record, Judge, that Mr. Harris has offered absolutely no assistance in jury selection because he's been unable to do so.

His response—

THE COURT: Then why have you asked—

[Harris's counsel]:—because out of curiosity—

THE COURT:—opportunity to discuss things with your client?

[Harris's counsel]:—out of curiosity, Judge, and in response to my professional obligations, I have turned to Mr. Harris and I asked Mr. Harris what about this juror, and Mr. Harris would utter forth a grunt or something of a reasonable facsimile which makes absolutely no comprehensible sense to me.

Just so your Honor is aware of that.

THE COURT: Does that have a bearing on the Sandoval ruling?

[Harris's counsel]: Well, Judge, it does to the extent that I cannot get any information from Mr. Harris about his prior offenses.

THE COURT: If you will pardon me and I mean no disrespect and no harm—

[Harris's counsel]: I understand.

THE COURT:—I think that the observation that you made and the context of which we're at now are improperly placed. That's merely an observation by the Court. We are concerned with a Sandoval ruling. I've made some obser-

vations and I'm prepared to accept the fact that at the present time I've seen no evidence to the contrary to indicate to my satisfaction certainly that Mr. Harris can't participate with you, cooperate effectively and also aid you in the trial of this action.

*Id.* at 682–84. After allowing the parties an opportunity to make final arguments, the trial judge ruled on the government's *Sandoval* motion. Largely adopting Harris's position, the trial judge held that the government could only inquire into one of Harris's prior convictions.

At no point during the hearing on the *Sandoval* issue did Harris's counsel renew his motion for a competency hearing. After the *Sandoval* hearing, the competency issue was not mentioned again at trial.[3]

## V. Harris's Challenge to the Prosecutor's Use of Peremptory Strikes During Jury Selection

On January 2, 1985, the state trial court began jury selection. The first black venire person to be examined was named McGruder. Both the prosecution and the defense accepted McGruder for the jury panel. However, on the following day, before any additional jurors had been selected, McGruder told the court that in 1961 he had been charged with a misdemeanor involving the carrying of weapons, that he was convicted, that he received a suspended sentence, and that he thereafter was granted a certificate of relief from civil disabilities. McGruder had failed to pro-

vide this information when questioned by the judge during his examination the previous day. *Id.* at 552.

After this disclosure, the prosecutor asked that McGruder be dismissed for cause or, in the alternative, that he—the prosecutor—be permitted to utilize a peremptory challenge to strike McGruder. The court denied the challenge for cause, but allowed the prosecutor to exercise a peremptory challenge. Harris's counsel objected to the exclusion of McGruder, arguing that McGruder was one of the few blacks on the panel of prospective jurors. The court nevertheless granted the prosecutor's application for leave to strike McGruder peremptorily. *Id.* at 552–58.

Later that afternoon, the prosecutor excused two more black potential jurors with peremptory challenges. Harris's counsel objected to their removal, stating:

> Judge, I want the record to reflect that at this time [the prosecutor] has challenged the two black jurors that we had sitting in the jury box, in addition to Mr. McGruder, okay, and both of those jurors I found to be acceptable. I think this is a purposeful attempt by [the prosecutor] to exclude black jurors.

*Id.* at 566–67. The judge offered to allow the parties "to make a separate argument afterwards," to which Harris's counsel replied, "Well, I say it's purposeful. Under [*McCray v. Abrams,* 750 F.2d 1113, 1133 (2d Cir.1984) ]." [4] *Id.* at 567. The prosecutor responded:

---

**3.** Harris contends, as he did on direct appeal and in the District Court, that his trial counsel made "repeated requests" for psychiatric evaluations to determine if Harris was competent to stand trial. However, Harris acknowledges that these requests were not recorded in the trial transcript. Therefore, for the purposes of this appeal, we conclude that Harris's counsel did not request a competency hearing during Harris's trial. *See Loria v.*

*Gorman,* 306 F.3d 1271, 1280 n. 2 (2d Cir. 2002) ("Ordinarily, material not included in the record on appeal will not be considered.").

**4.** In *McCray v. Abrams,* 750 F.2d 1113, 1133 (2d Cir.1984), the Second Circuit held that a prosecutor may not use peremptory challenges in a racially discriminatory manner. The Supreme Court announced a similar rule

I certainly would indicate just because [Harris's counsel] finds certain jurors qualified, does not mean the People do. I have specific reasons why I excluded the jurors that I have. I selected yesterday Mr. McGruder, who was a black juror, who was, I believe, the first one that came into view and because he was excused today had nothing to do with the fact that he was picked yesterday.

*Id.* at 568. After Harris's counsel declined the judge's invitation to respond to this argument, the judge proceeded with jury selection without further comment. *Id.*

The next time the judge asked for peremptory challenges, Harris's counsel may have again attempted to raise an issue regarding the prosecutor's exercise of peremptory challenges. Unfortunately, the record is not entirely clear what the issue was at that time, because the prosecutor interrupted, asking: "Can we do this after?" The judge replied: "We'll do this after." *Id.* at 605.

At the end of jury selection, all five black venire persons, including McGruder, had been peremptorily challenged by the prosecutor and subsequently removed from the panel. Harris's counsel again objected to the prosecutor's use of his peremptory challenges to strike these five potential jurors. *Id.* at 687. The judge, after hearing Harris's counsel's argument, responded:

Now, I'm troubled by what you stated because it seems to me that Mr. McGruder was a black man on Wednesday and on Thursday, but he was the same black man that he had accepted on Wednesday. Now, how could you argue that there is a systematic attempt to exclude blacks by the District Attorney's office of Nassau County when we had here, which was proof positive of the fact that

the prosecutor had accepted a black man on Wednesday?

*Id.* at 689–90. For this reason, the judge said, he did not "see the argument" Harris's counsel was making. *Id.* at 690.

Harris's counsel pointed out that, even assuming that McGruder was excused for a legitimate, non-discriminatory reason, the prosecutor used four other peremptory challenges against black venire persons. *Id.* Harris's counsel then asked for the court to have the prosecutor state on the record his reasons for excusing the black venire persons or produce his notes and records on voir dire with respect to those prospective jurors, or for the court to conduct a hearing on the matter. *Id.* at 691–92. In response, the court again pointed out that the prosecutor had, in fact, allowed McGruder to be seated; the court stated that "at the present moment, I do have the background of having had [the prosecutor] select at least one black juror." *Id.* at 692. The prosecutor again denied the allegations, stating:

I deny any allegation that [Harris's counsel] makes. I think [he] is the only one who has interjected race into this voir dire.... He's questioned each and every juror that came in here, black, white, whatever, with respect to their opinions on interracial dating, school busing, police brutality and he's tried to even go into the death penalty.

. . . .

I deny any systematic exclusion of black jurors. I did select Mr. McGruder who was acceptable to the People prior to his revealing the fact that he withheld a response to your question. And I specifically addressed myself to all those jurors with respect to the question of anyone who had been accused of a

in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), but *Batson* was

not decided until more than a year after Harris's trial.

crime.... And I submit on the record there is nothing that would be in violation of [*McCray* ]. I think [Harris's counsel's] request for a hearing and for an analysis of my notes is frivolous and in poor taste.

*Id.* at 692–93. The court then denied the request for a hearing. *Id.* at 694.

## VI. Harris's Appeals in the State Courts and His Federal Habeas Petition

■ Harris appealed his convictions to the Appellate Division claiming, inter alia, that: (1) the prosecutor used peremptory challenges to exclude black jurors unlawfully in violation of *Batson;* [5] and (2) he was not competent to stand trial because of his low IQ and his head injury. The Appellate Division held, sua sponte, that there was insufficient evidence to support Harris's intentional murder conviction, but otherwise affirmed the judgment of the trial court. *People v. Harris,* 160 A.D.2d 726, 555 N.Y.S.2d 607 (2d Dep't 1990). Harris then sought, and was denied, leave to appeal to the New York State Court of Appeals. *People v. Harris,* 76 N.Y.2d 893, 561 N.Y.S.2d 555, 562 N.E.2d 880 (1990).

Harris filed the present application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on April 25, 1997. He sought habeas relief on the same grounds as those presented in his direct appeal in the New York courts. On December 29, 1997, the District Court dismissed the petition as time-barred, but, on September 28, 1998, this Court entered an order vacating that judgment and remanding the case for (1) a determination of whether Harris

timely filed his petition; and (2) if the petition was timely filed, consideration of its merits. *See Harris,* 115 F.Supp.2d at 330.

On remand, the District Court held that the petition was timely filed. *Id.* at 333. The District Court then granted Harris's petition on the *Batson* issue, *id.* at 339, but denied the petition on all remaining grounds, *id.* at 348. Kuhlmann filed a motion asking the District Court to reconsider its decision on the *Batson* issue or, in the alternative, to hold a hearing to allow him to present evidence of the prosecutor's reasons for using his peremptory challenges as he did. App. 1367. The District Court denied Kuhlmann's motion in both respects. *Id.* at 1391. Kuhlmann filed his Notice of Appeal on December 19, 2000. *Id.* at 1393. Harris also filed, and the District Court denied, a motion seeking reconsideration of the District Court's denial of his petition with respect to the competence issue. Harris filed his Notice of Cross–Appeal on May 6, 2002.

## DISCUSSION

This appeal involves four issues, which we address in turn. First, Kuhlmann contends that the District Court erred by concluding that the state court incorrectly denied Harris's claim that the prosecutor used peremptory challenges in a racially discriminatory manner in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Second, Kuhlmann argues that, even if the District Court correctly determined that the state court erred by denying Harris's *Batson*

---

5. *Batson* was decided on April 30, 1986, approximately sixteen months after Harris's trial. However, in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Supreme Court held that the *Batson* rule, and all "new rule[s] for the conduct of criminal prosecutions," must be applied retroac-tively to all cases "pending on direct review or not yet final" at the time the new rule is decided. Because the *Batson* rule was determined in 1986, while Harris's direct appeals in state court were pending, *Batson* applies retroactively to Harris's prosecution.

claim, the District Court improperly granted Harris a new trial on that basis without first conducting a reconstruction hearing to determine, if possible, whether the prosecutor had valid, race-neutral reasons for using the peremptory strikes as he did. Third, Harris argues on cross-appeal that the District Court erred by denying him habeas relief on his claim that he was not competent to stand trial. Finally, Harris argues that the District Court erred by denying his motion seeking reconsideration of the denial of that portion of his habeas petition which was based on the competence issue.

## I. The *Batson* Claim

Kuhlmann argues that the District Court erred when it concluded that Harris's conviction was the result of an incorrect application of the Supreme Court's decision in *Batson*.[6] Although we conclude that the District Court erred in its application of the habeas standard of review, we nonetheless agree with the District Court's conclusion that the state court's denial of Harris's *Batson* claim was incorrect.

### A. *Standard of Review*

■ This Court reviews de novo a district court's decision to grant or deny a petition for a writ of habeas corpus. *Overton v. Newton*, 295 F.3d 270, 275 (2d Cir. 2002).

A petitioner may prevail on a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) based on a claim that was adjudicated on the merits in state court if the petitioner establishes that the adjudication of his or her claim in state court resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[7] In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court explained that a state court decision is "contrary to" clearly established federal law as determined by the Supreme Court "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the result reached by the Supreme Court]." *Id.* at 405, 120 S.Ct. 1495; *see also Bell v. Cone*, 535 U.S. 685, 686, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Sevencan v. Herbert*, 342 F.3d 69 (2d Cir.2003). A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495; *see also Bell*, 535 U.S. at 686, 122 S.Ct. 1843; *Sevencan*, 342 F.3d 69.

### B. *The Batson Standard*

The clearly established Federal law that governs Harris's claim that the prosecutor

---

**6.** As discussed in note 5, ante, although *Batson* was not decided until after Harris's trial, it governs this case because it was in effect at the time of Harris's appeal to the Appellate Division.

**7.** 28 U.S.C. § 2254(d) provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

used his peremptory strikes in a racially discriminatory manner was established by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). As this Court explained in *McKinney v. Artuz*, 326 F.3d 87 (2d Cir.2003):

> The *Batson* Court ... establish[ed] a three-step burden-shifting framework for the evidentiary inquiry into whether a peremptory challenge is race-based: First, the moving party—i.e., the party challenging the other party's attempted peremptory strike-must make a prima facie case that the nonmoving party's peremptory is based on race. Second, the nonmoving party must assert a race-neutral reason for the peremptory challenge. The nonmoving party's burden at step two is very low.... [A]lthough a race-neutral reason must be given, it need not be persuasive or even plausible. Finally, the court must determine whether the moving party carried the burden of showing by a preponderance of the evidence that the peremptory challenge at issue was based on race.

*Id.* at 97–98 (internal citations, quotation marks and footnote omitted). In *Overton*, we explained the showing required to establish a prima facie case as follows:

> To establish a *prima facie* case under *Batson*, a defendant must show that the circumstances surrounding the peremptory challenges raise an inference of discrimination. Specifically, ... [i]n deciding whether the defendant has made the requisite [*prima facie* ] showing, the tri-

al court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.

*Overton*, 295 F.3d at 277–78 (citing *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712).

### C. *The District Court's Decision*

The District Court held that the Appellate Division's decision[8] affirming the trial court's denial of Harris's motion for a hearing on the prosecutor's use of his peremptory challenges during voir dire, was "contrary to" clearly established Supreme Court precedent. In reaching this conclusion, the court first determined that Harris "made out a prima facie showing of racial discrimination," as follows:

> The evidence is clear that five black venire persons were challenged peremptorily by the prosecutor and removed from the jury panel. These five blacks constituted the entire array of black prospective jurors. This evidence was sufficient to make out a prima facie showing of intentional discrimination.

*Harris*, 115 F.Supp.2d at 339 (citations omitted). Once it determined that Harris made out a prima facie case, the District Court noted that "[t]he trial court did not

**8.** In its decision, the Appellate Division did not specifically discuss the *Batson* issue. Instead, the court made the general statement that it had "examined the defendant's remaining arguments and [found] them to be without merit," and cited, inter alia, a case in which it had previously applied the *Batson* standard. *See People v. Harris*, 160 A.D.2d 726, 726, 555 N.Y.S.2d 607, 608 (2d Dep't 1990) (citing, inter alia, *People v. Bridget*, 139 A.D.2d 587, 527 N.Y.S.2d 81 (2d Dep't 1988)). As this

Court explained in *Sellan v. Kuhlman*, 261 F.3d 303 (2d Cir.2001), a state court need not explain its reasoning or explicitly refer to the petitioner's federal claim in order to adjudicate a claim on the merits sufficient to warrant habeas review. It is enough that the state court "(1) dispose[d] of the claim 'on the merits,' and (2) reduce[d] its disposition to judgment," *see id.* at 312, both of which were done here.

complete the second or third steps required [by *Batson*]," because the trial court denied Harris's motion to hold a hearing on the issue. Therefore, the District Court concluded, "the state courts' actions resulted in a decision that was contrary to the clearly established law of the United States as determined by the Supreme Court." *Id.*

### D. *Analysis*

■ As an initial matter, we note that the District Court erred by analyzing Harris's claim under the "contrary to" prong of § 2254(d)(1). Under *Williams,* a state court decision is not "contrary to" Supreme Court precedent unless "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495. The District Court did not identify any Supreme Court case with materially indistinguishable facts, nor did the District Court identify any question of law that the state courts decided differently than the Supreme Court did in *Batson.*

■ The District Court should have analyzed Harris's *Batson* claim under the "unreasonable application" prong of the AEDPA habeas standard of review. As the Supreme Court stated in *Bell v. Cone,* " § 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.... The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the

facts of a particular case." 535 U.S. at 694, 122 S.Ct. 1843 (citing *Williams,* 529 U.S. at 404–08, 120 S.Ct. 1495). The Appellate Division reviewing Harris's case correctly identified the relevant federal law applicable to Harris's *Batson* claims, because in summarily affirming the trial court it cited a case applying the holding of *Batson.* See *People v. Harris,* 160 A.D.2d 726, 726, 555 N.Y.S.2d 607, 608 (2d Dep't 1990) (citing, inter alia, *People v. Bridget,* 139 A.D.2d 587, 527 N.Y.S.2d 81 (2d Dep't 1988)). Under *Williams* and *Bell v. Cone,* therefore, the District Court should have conducted its analysis under the "unreasonable application" prong of § 2254(d)(1), rather than the "contrary to" prong. However, this technical error does not undermine the ultimate correctness of the District Court's conclusion that the state court improperly denied Harris's *Batson* claim.

■ "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495. It is undisputed that the state trial court failed to conduct the type of inquiry into the prosecutor's reasons for striking the last four black potential jurors that is required at the second and third steps of the *Batson* analysis. Thus, the dispositive question under the "unreasonable application" prong of § 2254(d)(1) is whether it was "objectively unreasonable" for the Appellate Division to determine that Harris failed to make a prima facie showing of race-based purpose before the state trial court.

Because the Appellate Division did not specifically discuss the *Batson* issue, yet

relied on a case applying *Batson*, we must construe its summary holding as an affirmation that the trial court proceedings, though conducted prior to *Batson*, did not violate the Supreme Court's holding in that case. Thus, in reviewing the Appellate Division's decision, we must focus on the trial court's treatment of peremptory strikes.

The state trial court acknowledged the fact that the prosecutor used peremptory strikes to exclude all five black potential jurors, but was apparently convinced that the prosecutor's initial acceptance of McGruder established that the prosecutor was not engaged in a "systematic attempt to exclude blacks." Harris's counsel pointed out that, even assuming that McGruder was excused for a legitimate, non-discriminatory reason, there was still evidence of possible racial discrimination in the fact that the prosecutor used four other peremptory challenges against black venire persons. However, the state trial court ultimately concluded, based solely on the fact that the prosecutor had initially selected McGruder, that there was no reason to hold a hearing to inquire into the reasons the prosecutor used his peremptory strikes in the manner that he did.

▮ Kuhlmann argues that the state trial court's decision (and, by extension, the decision of the Appellate Division affirming it) could not have been "objectively unreasonable" because Harris presented "only statistical evidence of discrimination and '[m]any courts throughout the nation have held that a prima facie case of discrimination can rarely, if ever, be established by a showing that consists of nothing more than the number of peremptory challenges exercised against the protected class.'"

Resp't–Appellant–Cross–Appellee's Br. at 33–34 (collecting cases). However, the cases Kuhlmann cites stand not for the narrow proposition that Kuhlmann argues, but rather for the broader proposition that an assessment of the sufficiency of a prima facie showing in the *Batson* analysis should take into consideration "all relevant circumstances" including, but not restricted to, the "pattern" of strikes. *See, e.g., McCain v. Gramley*, 96 F.3d 288, 292 (7th Cir.1996) ("Courts must look to the totality of the circumstances." (citing *Batson*, 476 U.S. at 97, 106 S.Ct. 1712)); *Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir.1998) ("Courts have used a . . . multi-factor analysis in analyzing prima facie showings under *Batson*.")

▮ In order to determine whether the Appellate Division applied *Batson* in an "objectively unreasonable" manner, we must examine the United States Supreme Court law applicable to the *Batson* claim at the time of the Appellate Division's judgment. *See Williams*, 529 U.S. at 412, 120 S.Ct. 1495 ("[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings . . . of this Court's decisions as of the time of the relevant state-court decision."). Supreme Court precedent on the sufficiency of a prima facie showing under *Batson* in 1990 consisted only of *Batson* itself. In *Batson*, the Supreme Court provided, as a primary example of what might constitute a prima facie showing, that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. Here, where every black juror was subject to a peremptory strike, a "pattern" plainly exists. As the District

Court observed, "five black venire persons were challenged peremptorily by the prosecutor and removed from the jury panel," and "[t]hese five blacks constituted the entire array of black prospective jurors." *Harris*, 115 F.Supp.2d at 339; *cf. United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991) (noting, albeit in a case on direct appeal rather than habeas review, that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under *Batson* "). We therefore agree with the District Court that, in highlighting a 100% pattern of the use of peremptory strikes against prospective black jurors, "[p]etitioner made out a prima facie showing of racial discrimination resulting from the prosecutor's pattern of peremptory strikes." *Harris*, 115 F.Supp.2d at 339.

Kuhlmann contends, however, and the state trial court apparently agreed, that the persuasive strength of this pattern is fatally undermined by the additional fact that the prosecutor initially accepted McGruder. Although we agree that, under *Batson*, the fact that the prosecutor initially accepted one black juror is a circumstance that might tend to rebut an inference that the prosecutor used his peremptory strikes in a discriminatory manner, *see Batson*, 476 U.S. at 97, 106 S.Ct. 1712 (charging trial judges to consider "the circumstances concerning the prosecutor's use of peremptory challenges" to evaluate whether the defendant has established a prima facie case of discrimination), we do not agree that this fact alone was sufficient to refute an otherwise-appropriate inference.

Even if we were to conclude that the decision to strike McGruder was legitimate, the fact remains that the prosecutor used peremptory strikes to remove all four of the other black potential jurors as well. As we explained in *Alvarado*, "[a] prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use *all* of his challenges against minorities," 923 F.2d at 256 (emphasis supplied); *see also, e.g., United States v. Johnson*, 873 F.2d 1137, 1139 (8th Cir.1989) ("We reject the Government's contention ... that the mere presence of two blacks on a jury automatically negates a *Batson* violation."); *United States v. Clemons*, 843 F.2d 741, 747 (3d Cir.1988) ("Striking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks."). The fact that the prosecutor in this case was initially willing to accept one black juror is not sufficient to exempt from scrutiny the prosecutor's later decisions to strike all four of the remaining black potential jurors.

For these reasons, we conclude that, even taking into account the prosecutor's initial acceptance of a single black juror, it was "objectively unreasonable" for the Appellate Division to conclude, by summarily affirming the trial court, that petitioner failed to make out a prima facie case of discrimination under *Batson* in the instant case, where all five prospective black jurors were eliminated by peremptory strike. Because it is undisputed that the state trial court did not conduct the type of inquiry required in the second and third steps of the *Batson* inquiry, we conclude that Harris has established that the Appellate Division's rejection of his *Batson* claims on appeal was an "unreasonable

application" of *Batson* for the purposes of habeas relief under § 2254(d)(1).

## II. The District Court's Decision To Grant Harris a New Trial, and Kuhlmann's Motion Seeking Reconsideration or, in the Alternative, a Hearing on the *Batson* Issue

Having concluded that the state court erred in its treatment of Harris's *Batson* claim, the next question is: to what relief is Harris entitled? The District Court determined that Harris was entitled to a new trial. Kuhlmann contends that the District Court erred by ordering a new trial without first conducting a reconstruction hearing to determine, if possible, whether the prosecutor had legitimate reasons for using the peremptory strikes as he did.[9] For the reasons given below, we agree with Kuhlmann.

### A. *The District Court's Initial Decision*

After it concluded that the state court had committed error on the *Batson* issue, the District Court then turned to the question of the appropriate remedy. The Court correctly recognized that it could either: 1) "hold a reconstruction hearing and take evidence regarding the circumstances surrounding the prosecutor's use of the peremptory challenges to the five excluded black jurors"; 2) "return the case to the state trial court on a conditional writ of habeas corpus so that the state court could conduct the inquiry on its own"; or 3) order a new trial. *Harris*, 115 F.Supp.2d at 340 (citing, inter alia, *Tankleff*, 135 F.3d at 250, and *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir.1992)). With respect to the third of these options, the District Court noted that this Court has stated that "there are cases where the passage of time may impair a trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected. Where such [demonstrably][10] exists, there must be a new trial." *Id.* (citing *Brown*, 973 F.2d at 121).

The District Court then decided that a new trial was the appropriate remedy, reasoning as follows:

> In this case, more than fifteen and a half years have passed since Harris'[s] trial.... In the last fifteen years, the persons involved in Harris'[s] jury selection likely have moved on to other phases and stations in life, and their minds likely have been filled with other matters, far removed from the events of January 1985. In fact, the Court takes judicial notice of the fact that Judge Ain has retired from the bench, and Daniel Cotter, then an assistant district attorney, is

---

9. Throughout this opinion we refer to the inquiry undertaken in the second and third steps of the *Batson* analysis as a question of "whether the prosecutor had legitimate reasons for using the peremptory strikes as he did." However, by using this shorthand description of the *Batson* analysis, we do not intend to imply that the prosecutor, at any point, bears the burden of persuasion with respect to the legitimacy of his or her use of peremptory challenges. As we explained in *United States v. Thomas*, 320 F.3d 315 (2d Cir.2003):

> Under *Batson*'s burden-shifting procedure, the burden of production may shift to the

non-movant, but the 'ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' The government thus is not required, when challenged, to persuade the court that its race-neutral reasons for striking jurors are valid or tactically sound; it is enough that they are the government's reasons.

*Id.* at 320 (internal citation omitted).

10. The District Court's opinion omitted the word "demonstrably" from the quoted passage.

now himself a judge of the Nassau County Court. Under the circumstances, fifteen years is a very long time. A hearing at this juncture would be akin to an attempt to repair a broken cobweb. *Id.*

### B. *Kuhlmann's Motion for Reconsideration*

In response to this holding, Kuhlmann filed a motion under Federal Rule of Civil Procedure 60(b) for reconsideration, and under Federal Rule of Civil Procedure 59(e) to amend the judgment for the purpose of granting a hearing. In support of both motions, Kuhlmann argued that the District Court erred by concluding, without making any inquiry or allowing the parties an opportunity to argue or present evidence, that a reconstruction hearing would be "a practical impossibility." *Harris*, 115 F.Supp.2d at 340. Kuhlmann proffered: (1) the testimony of the prosecutor who had tried Harris's case in the state court, and who claimed to recall the details of the jury selection; and (2) notes taken by the prosecutor at the time of the trial, and retained in the district attorney's office since the trial. Kuhlmann acknowledged that he had not asked the District Court for a reconstruction hearing in his initial briefs due to his belief that Harris's claim was without merit, but pointed out that, in the appeal in the state courts, the government had asked for a hearing if the Appellate Division held Harris had met his prima facie burden. App. 1384–85.

The District Court denied the motion for reconsideration without mentioning the proffer of evidence about the prosecutor's motives. *Id.* at 1391.

### C. *Standard of Review*

This Court reviews a district court's denial of a Federal Rule of Civil Procedure 60(b) motion for reconsideration for an abuse of discretion. *Malik v. McGinnis*, 293 F.3d 559, 561 (2d Cir.2002). The denial of a motion to amend a judgment under Federal Rule of Civil Procedure 59 "will not be overturned on appeal absent an abuse of discretion." *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983).

The question of whether it would be productive to hold a hearing after the fact to determine whether the prosecutor exercised peremptory strikes in a racially discriminatory manner is committed to the discretion of the trial court. *See Tankleff*, 135 F.3d at 250. Therefore this Court reviews such a decision for abuse of that discretion.

### D. *Analysis*

We conclude that the District Court abused its discretion by denying Kuhlmann's motion seeking a reconstruction hearing to determine, if possible, whether the prosecutor had legitimate reasons to use his peremptory strikes to strike the black potential jurors. Although the decision to hold such a hearing is within the discretion of the District Court, this Court has said that "if appropriate findings may be conveniently made, this should be done." *Brown*, 973 F.2d at 121 (quoting *Alvarado*, 923 F.2d at 256). Moreover, the District Court has the discretion to order a new trial only where it is "demonstrably" true that "the passage of time [has] impair[ed] the trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected." *Id.*

There was no such demonstration of the effect of the passage of time here. Instead, the District Court relied only on the facts that a significant amount of time had elapsed, the trial judge had retired, and the former prosecutor had become a judge. *Harris*, 115 F.Supp.2d at 340. The Court made no inquiry into or determination of

what effect those facts would have on the feasibility of a reconstruction hearing.

Furthermore, even if the initial decision to order a new trial was a permissible exercise of the District Court's discretion, the subsequent denial of Kuhlmann's motion for reconsideration—a denial made without any mention of the newly proffered evidence—was an abuse of that discretion. Therefore, we vacate that portion of the District Court's judgment that granted Harris a new trial, and we remand the case for the District Court to hold a reconstruction hearing, *see, e.g., Brown*, 973 F.2d at 121–22; *Alvarado*, 923 F.2d at 256, and complete the inquiries required at the second and third steps of the *Batson* test.

## III. The Question of Harris's Competence To Stand Trial

In his cross-appeal, Harris contends that he is entitled to habeas relief based on his claim that the state trial court violated his due process rights by failing to order a competence examination at the time of his trial. Harris acknowledges that there is no indication in the record before this Court that his trial counsel requested a competence examination at the time of Harris's trial. Nonetheless, Harris contends that, given the evidence before the trial court (the evidence of Harris's low I.Q., the fact that Harris had recently been shot in the head, Harris's request for a competence hearing approximately two months before the trial, along with Harris's reaction to questions at the earlier hearing), the trial court should have ordered a competence examination sua sponte.

The Appellate Division rejected this argument without specific comment. *See People v. Harris*, 160 A.D.2d at 726, 555 N.Y.S.2d at 608 (citing, inter alia, *People v. Armlin*, 37 N.Y.2d 167, 371 N.Y.S.2d 691,

332 N.E.2d 870 (1975), and *People v. Corwise*, 120 A.D.2d 604, 502 N.Y.S.2d 223 (2d Dep't 1986)). The District Court concluded that Harris was not entitled to habeas relief on this claim because Harris's trial counsel did not request a competence examination at the time of Harris's trial, and there was insufficient evidence to require the trial court to order a competence hearing sua sponte.

Although we disagree with several aspects of the District Court's analysis of Harris's competence claim, we agree with the District Court's ultimate conclusion that Harris is not entitled to habeas relief on this basis. After a review of all of the evidence before the trial court, we conclude that Harris has failed to establish that his federal constitutional rights were violated by the state court's decision that Harris was not entitled to a competence hearing before or at the time of his trial. *See Gaines v. Kelly*, 202 F.3d 598, 601 (2d Cir.2000) ("To obtain habeas relief *petitioner must demonstrate* by a preponderance of the evidence that his federal constitutional rights were violated." (emphasis added)).

### A. *The Relevant Legal Standard*

■ The constitutional right to due process is violated when a person who is incompetent is convicted of a crime, whether the conviction follows a trial or a plea of guilty. *See Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Drope v. Missouri*, 420 U.S. 162, 171–73, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). As the Supreme Court explained in *Cooper*, "[a] defendant may not be put to trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of

the proceedings against him." 517 U.S. at 354, 116 S.Ct. 1373 (citations, internal quotation marks and ellipsis omitted).

■ Moreover, "the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination." *Cooper*, 517 U.S. at 354 n. 4, 116 S.Ct. 1373 (citing *Pate*, 383 U.S. at 384, 86 S.Ct. 836). As this Court explained in *Nicks v. United States*, 955 F.2d 161 (2d Cir.1992), "a hearing must be held when there is reasonable ground for a [trial] court to conclude that the defendant may not be competent to stand trial." *Id.* at 168. Of course, "[i]t is axiomatic that in reviewing whether this obligation was properly discharged only evidence before the court at the time its decision was made is pertinent." *Id.*

Finally, "[t]here are ... no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180, 95 S.Ct. 896. In the end, then, the "inquiry is whether, 'in light of what was then known [to the trial court], the failure to make further inquiry into [Harris's] competence to stand trial[ ] denied him a fair trial.'" *Nicks*, 955 F.2d at 169 (citing *Drope*, 420 U.S. at 174–75, 95 S.Ct. 896).

■ When we inquire, on habeas review, into whether Harris was denied a fair trial, "we must presume the state court's findings of fact are correct, unless the petitioner meets the 'burden of rebutting th[is] presumption of correctness by clear and convincing evidence.'" *LanFranco v. Murray*, 313 F.3d 112, 117 (2d Cir.2002) (quoting 28 U.S.C. 2254(e)(1) and citing *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir.2002)). "This presumption of correctness is particularly important when re-

viewing the trial court's assessment of witness credibility." *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.2003); *Shabazz v. Artuz*, 336 F.3d 154, 161 (2d Cir.2003). Furthermore, a petitioner is not entitled to habeas relief unless the state court applied the "clearly established Federal law, as determined by the Supreme Court" to the facts of the petitioner's case in an "objectively unreasonable manner." 28 U.S.C. § 2254(d)(1); *LanFranco*, 313 F.3d at 118; *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir.2001) ("Under § 2254(d)(1), we must determine not whether the state court was incorrect or erroneous in rejecting [petitioner's] ... claim, but whether it was 'objectively unreasonable' in doing so.") (citing *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (plurality opinion)).

### B. *The District Court's Decision*

In analyzing Harris's claim, the District Court first held that the state trial court erred by failing to hold a competence hearing in October 1999 (when Harris made a motion seeking such a hearing under N.Y.Crim. Proc. Law § 730.30). The District Court stated that:

> [I]t is patently obvious that during the proceedings held on October 17, 1984, Harris'[s] responsiveness and lack of understanding indicated his inability to comprehend the proceedings. For example, he did not know the day of the week, and he said he had not spoken recently to his attorney. The cursory questioning of Harris conducted by the court was insufficient to ascertain whether Harris may have been mentally incapacitated at that time and thus incapable of proceeding toward trial.

*Harris*, 115 F.Supp.2d at 345 (citations omitted). Accordingly, the District Court concluded that:

[T]he circumstances before the trial court in October 1984 presented a reasonable ground for believing that Harris was, at that moment, incompetent to stand trial. Petitioner's mental deficiencies were never disputed by the People, nor did the People contest the fact that Petitioner had been shot in the head and was still recovering from that wound, nor the fact that Harris was taking medication at the time to assist his recovery. Moreover, defense counsel's statements that he could not communicate with Harris gave increased urgency to the issue, as did the bizarre responses given by Petitioner to the court during the hearing on the motion.

*Id.* at 346.

However, the District Court then concluded that the dispositive inquiry was not whether the trial court's failure to order a competence examination in October 1984 was error, but rather, whether the state trial court committed constitutional error by failing to make sufficient inquiry into Harris's mental condition at the time of Harris's trial in January 1985. *Id.* The District Court noted that "incapacity or incompetence to stand trial can come and go," and the "proposition that a defendant may be competent at one point and incompetent at a later point is equally valid in reverse. That is, a defendant may be incompetent at one point but competent later on, which may have been the case here." *Id.* at 347 (citing *Drope*, 420 U.S. at 181, 95 S.Ct. 896) ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."). Based on this premise, the District Court rejected Harris's claim, reasoning as follows:

Despite having determined that Harris'[s] due process rights would and should have been better protected by a competency hearing or psychiatric examination in October 1984, the Court cannot ignore that the actual trial of this matter did not take place until some two and a half months later. Nor can the Court ignore the absence of any subsequent arguments or applications *at trial* regarding Harris'[s] mental state. Without any evidence to the contrary, and without any application or motion having been made on the record, the Court must presume that Harris was not incapacitated at the time of trial in January 1985. It is logical to presume that Harris'[s] condition—as far as the bullet wound—had improved between October 17, 1984 and January 2, 1985 when voir dire began. To the extent that Harris's medication was causing some or all of his difficulties in October, it is likely that the medication had been reduced or eliminated entirely by January 1985. Thus, despite the fact that the trial court should have ordered an examination in October 1984, the Court cannot say that the failure to do so deprived Harris of his constitutional right to a fair trial two and a half months later.

*Id.* at 346–47.

C. *Analysis*

■■■ First, we take issue with one aspect of the District Court's articulation of the applicable standard of review. Although the District Court correctly noted that "on habeas review, the state court's findings of fact, if any, are presumed correct," *id.* at 341 (citing 28 U.S.C. § 2254(e)(1)), the Court erroneously stated that "[d]eference to the state courts' legal determinations arising from record facts is not required when considering an inquiry into a petitioner's mental condition under

the Due Process Clause," *id.* at 342 n. 6. In support of this latter premise the District Court cited the Supreme Court's decision in *Drope*, 420 U.S. at 175 & n. 10, 95 S.Ct. 896. This portion of the standard of review applied in *Drope*, however, is not applicable in the present case. In *Drope* the Supreme Court reviewed the state court decision directly, rather than collaterally through a habeas petition. In the present case, because the state court adjudicated Harris's competence claim on the merits, our review of legal determinations by the state courts is limited, and "we may not grant the writ ... unless [the state court] adjudication [of Harris's claim] 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Cox v. Miller*, 296 F.3d 89, 101 (2d Cir.2002) (quoting 28 U.S.C. § 2254(d)(1) and citing *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495).

■ We express no view on the validity of the notion, relied upon by the District Court, that Harris's claim fails because he failed to request a competence hearing at the time of his trial, even though he sought (and, in the District Court's view, was improperly denied) such a hearing two months before trial. We need not do so because we conclude, for the reasons given below, that it was not objectively unreasonable, once appropriate deference is accorded to the factual determinations of the state trial court, for that court to have denied Harris's motion for a competence hearing in October of 1984, and that there was insufficient evidence to require that court to have, sua sponte, conducted a competence hearing at trial.

### 1. The State Trial Court's Denial of Harris's Motion for a Competence Hearing on October 17, 1984

Harris argues, and the District Court agreed, that the state trial judge erred by denying Harris's motion for a competence hearing on October 17, 1984. In support of this position, both Harris and the District Court cited four evidentiary factors: (1) evidence of Harris's low intelligence; (2) the fact that Harris had recently been shot in the head (and the bullet remained lodged in his brain); (3) the "bizarre" responses Harris gave when questioned by the trial judge; and (4) statements by Harris's trial counsel to the effect that he was having great difficulty communicating with Harris. However, as we explain below, the evidence Harris cites in support of his position neither supports his argument as effectively as he contends, nor was the only significant evidence before the state court.

#### a. *Harris's Intelligence*

First, we note that, contrary to the District Court's statement that "[Harris's] mental deficiencies were never disputed by the People," the government did, in fact, challenge the severity and nature of Harris's mental deficiencies. To be sure, the government acknowledged that Harris's intelligence was below average. However, the prosecutor challenged Dr. Feldman's view that Harris was in the "borderline intellectual functioning" category and questioned the validity of the quantitative assessments (*e.g.*, I.Q. and reading ability) contained in the Hartford School Department records upon which Dr. Feldman relied. Additionally, the prosecutor suggested that Harris may have been malingering when he was examined by Dr. Feldman in order to bolster his argument that he had not voluntarily waived his *Miranda* rights.

When the state trial court denied Harris's motion to suppress, the court largely accepted the government's position. The court explicitly concluded that Harris's intelligence was in the "low-normal" range, as Dr. Feldman had initially concluded. Thus the court rejected Dr. Feldman's later testimony to the effect that Harris was in the lower "borderline intellectual functioning" range. This is a factual determination, which we presume to be correct. *See Parsad*, 337 F.3d at 181 ("[The] presumption of correctness [mandated by 28 U.S.C. § 2254(e)(1)] is particularly important when reviewing the trial court's assessment of witness credibility."). The state trial court also appeared to accept the possibility that Harris was malingering. Although the court did not express these conclusions until it denied Harris's motion to suppress—a month and a half after the October 17, 1984 hearing—they nonetheless provide insight into the trial court's assessment of the credibility of Dr. Feldman's testimony about Harris's intellectual capabilities.

Finally, the effect of Harris's mental deficiencies on his competence to stand trial was addressed—albeit not in the form of a formal competence hearing—in the context of the pre-trial suppression hearing. In that hearing, the expert that examined Harris testified that, despite Harris's limited intelligence, Harris was competent to stand trial. The state trial court credited this portion of Dr. Feldman's testimony, *see* App. at 441, and Harris never challenged it. Therefore, again, we presume that the state trial court's factual determinations with respect to this issue are correct.

b. *Evidence Concerning the Effect of Harris's Head Injury*

Thereafter, however, Harris did request a competency hearing, citing the fact that he had recently been shot in the head, and the bullet remained lodged in his brain. Although it is reasonable to assume (perhaps even to expect) that a person who suffers a gunshot wound to the head might, at least for a time, have a diminished mental capacity relative to that person's mental capacity before the gunshot wound, the mere existence of Harris's head injury was not enough to require a competence examination. Harris's head injury is only relevant if it actually produced a diminished capacity at the time of Harris's trial.

However, there is no evidence, other than the statements of Harris's trial counsel and the cryptic nature of Harris's response to the trial judge's questions at the October 17, 1984 hearing (both of which we discuss below), to support the notion that Harris suffered lingering effects of the gunshot wound of a type that might warrant a competence examination. In order to obtain habeas relief, Harris has the burden of showing that his federal constitutional rights were violated by the state judge. However, Harris's counsel failed to submit any medical documentation about the effects (if any) of the injury on Harris's competence. Nor did he submit a list of medications Harris was taking, or documentation about the side effects (if any) of any medication Harris was taking. We know that Harris was competent to stand trial before the shooting, but very little is presented to show the effect of the shooting on Harris's competency.

On the other hand, there was evidence proffered to the state trial court suggesting that Harris had recovered from the gunshot wound without any serious adverse effect on his mental capacity. During the October 17, 1984 hearing, the prosecutor stated that: (1) Harris had been released from the hospital and returned to the jail; and (2) jail personnel with whom the prosecutor had spoken that morning

reported that "[t]hey ha[d] no problem in communicating with [Harris] and ha[d] made no noticeable observation of any inability to communicate at th[at] time."

### c. Harris's Response to the State Trial Judge's Questions During the October 17, 1984 Hearing

Another significant piece of evidence cited by Harris and the District Court is the "bizarre" nature of the responses Harris gave to the trial judge's questions at the October 17, 1984 hearing. The District Court concluded that it was "patently obvious that during the proceedings held on October 17, 1984, Harris' responsiveness and lack of understanding indicated his inability to comprehend the proceedings. For example, he did not know the day of the week, and he said he had not spoken recently to his attorney." *Harris*, 115 F.Supp.2d at 345. We agree that evidence that a defendant did not know the day of the week and did not recall the last time he spoke to his attorney (when, in fact, it was obvious that he had spoken to his attorney several minutes prior) could be strong evidence that a competence hearing is warranted. However, we do not agree with the District Court's conclusion that Harris's answers to the trial judge's questions necessarily establish that he was unaware of the day of the week or when he last spoke to his attorney.

Based on the trial transcript alone, we cannot determine whether Harris was legitimately confused in his answers, or he was simply uncooperative. During the earlier suppression hearing, the government argued (and the trial court apparently agreed) that Harris was malingering— exaggerating his apparent mental limitations in order to bolster his legal arguments. Thus, another reasonable interpretation of Harris's responses to the trial

judge's questions is that Harris was being deliberately uncooperative in order to support the perception that he was incompetent to stand trial.

Based solely on the bare language of the trial transcript, without neither detailed findings of fact nor evidence about Harris's demeanor during the hearing, it is impossible for us to determine which view of this evidence is the correct one. We do know that the trial judge had observed Harris conferring with counsel during the hearing, and that immediately following the strange answers the judge stated that, based upon his observations of defendant during questioning, he was constrained to deny the motion. In such circumstances, an appellate court should generally defer to the conclusions of the trial judge, who was present in the courtroom and in a position to assess the defendant's demeanor. *See Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir.1996) ("[W]e must accord great deference to the trial court's findings regarding credibility because the trial judge is in the best position to evaluate a witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says."). This is especially appropriate in a habeas case, in which the state court's factual determinations are presumed to be correct and the petitioner bears the burden of establishing that he is entitled to relief.

### d. Statements by Harris's Trial Counsel

Finally, Harris argues that a competence hearing was required because Harris's trial counsel reported that he was unable to communicate effectively with Harris. The Supreme Court has acknowledged that "representations [by defense counsel] concerning the competence of his client ... [are] unquestionably a factor

which should be considered" when determining whether that client is competent. *Drope,* 420 U.S. at 177 n. 13, 95 S.Ct. 896. In the instant case, the transcript reflects that the trial judge considered the representations of Harris's counsel regarding Harris's competence, asking the prosecutor directly: "How do you respond to [Harris's counsel's] oral argument that irrespective of the fact that none of the personnel that you've described have difficulty in communicating with the defendant Harris that he [Harris's counsel] has difficulty communicating with [Harris] …?"

However, it is indisputable that courts are not required to accept the representations of defense counsel "without question." *Id.* On the contrary, such representations are merely one factor to be considered by the court, including, in this case, the court's own observation of the defendant's conduct and evidence concerning the effects of Harris's injury, as well as evidence adduced at Harris's pre-injury competence hearing.

### e. *The Cumulative Weight of this Evidence*

The District Court concluded, citing the evidence discussed above, that "the circumstances before the trial court in October 1984 presented a reasonable ground for believing that Harris was, at that moment, incompetent to stand trial." *Harris,* 115 F.Supp.2d at 346. However, the relevant question in this case is not whether the evidence "presented a reasonable ground for believing" that Harris was incompetent; instead we must ask whether it was *objectively unreasonable* for the state trial court to have concluded (and the state appeals court to have agreed) that the circumstances *did not* present a reasonable ground for believing that Harris was incompetent. *See Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002) ("Under § 2254(d)(1), we must determine not whether the state court was *incorrect or erroneous* in rejecting petitioner's claim, but whether it was *objectively unreasonable* in doing so." (citation, internal quotation marks and ellipsis omitted)).

Considering all of the evidence before the state trial court at the time of the October 17, 1984 hearing, we cannot conclude that it was objectively unreasonable for the court to have denied Harris's motion for a competence hearing. Although there was evidence to support the notion that Harris was incompetent (*e.g.,* Harris's low I.Q., the fact of the recent gunshot wound to his head, and his attorney's statement that Harris was uncommunicative), there was also evidence to the contrary. The prosecutor proffered evidence that Harris had left the hospital, returned to the prison population and was recovering from his injury. There was evidence that Harris had, in fact, been conferring with his attorney (although there was no evidence about the substance of any conversations between Harris and his attorney at that time). Moreover, there was evidence suggesting that Harris had malingered in the past in order to bolster his legal arguments, and may have been doing so again.

The trial judge, having observed Harris in the courtroom over the course of several proceedings and heard several days of testimony about Harris's mental capabilities and demeanor, was in a better position to assess this evidence than are we. *See United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986) ("[D]eference is owed to the [trial] court's determinations [about a defendant's competence] based on observation of the defendant during the proceedings."). Consequently, based on the evidence in the record, we cannot conclude that the trial court's denial of Harris's

motion for a competence hearing was objectively unreasonable.

However, this question does not end our analysis. The ultimate question upon which Harris's claim turns is whether the state trial court committed constitutional error by failing to order sua sponte a competence hearing at the time of Harris's trial. The District Court held that it did not, and with this conclusion we agree. See Harris, 115 F.Supp.2d at 347.

### 2. The Trial Court's Failure To Order Sua Sponte a Competence Hearing at the Time of Harris's Trial

 The evidence that Harris offers in support of his contention that the District Court erred by failing to order a competence hearing sua sponte at the time of Harris's trial is largely the same evidence as that offered in support of Harris's October 1984 motion for a competence hearing. The only evidence available to the state trial court at the time of Harris's trial that was not available at the time of the earlier hearing are the statements of Harris's counsel during the Sandoval hearing prior to trial.

However, although these statements—to the effect that Harris was unable to communicate effectively with his counsel or otherwise assist in his own defense—could, if credited, raise a question about Harris's competence, it appears that the state trial court did not credit them. For example, when Harris's counsel stated that he was unable to communicate with Harris, the trial court pointed out that counsel had repeatedly sought opportunities to confer with Harris during jury selection. Thereafter, the trial judge told Harris's trial counsel that he had "seen no evidence ... to indicate to my satisfaction certainly that Mr. Harris can't participate with you, cooperate effectively and also aid you in the trial of this action."

Given the state trial court's apparent unwillingness to credit Harris's counsel's statements about the extent of Harris's ability to communicate with his counsel or participate in his own defense, we cannot hold that it was objectively unreasonable for the trial court not to order a competence hearing. By the time of Harris's trial, more than three months had elapsed since Harris was shot, and Harris had been out of the hospital for more than two months. Harris had not submitted any medical documentation about the lingering effects (if any) of his head injury. Moreover, although Harris's counsel complained that Harris was uncommunicative, Harris's counsel did not renew his prior motion for a competence hearing. Consequently, we cannot conclude that, "in light of what was ... known [to the state trial court at the time of the trial], the failure to make further inquiry into [Harris's] competence to stand trial[ ] denied him a fair trial." Nicks, 955 F.2d at 169 (quoting Drope, 420 U.S. at 174–75, 95 S.Ct. 896 (internal quotation marks omitted)). On the contrary, as the District Court noted, "there is scant evidence in the [state] trial record to suggest [Harris's] competency was sufficiently in doubt at the time of his trial." Harris, 115 F.Supp.2d at 347. Accordingly, we affirm that portion of the District Court's decision which denied Harris habeas relief on his incompetence claim.

### IV. Harris's Motion Seeking Reconsideration of the Competence Issue

On February 27, 2001, Harris filed a Rule 60(b) motion seeking reconsideration of the District Court's denial of his petition with respect to the competence issue. In support of this motion Harris submitted evidence that showed that Harris's trial counsel, as part of an omnibus post-trial motion, sought a competence hearing 11 days after Harris's trial ended. Harris's

App. 152. The District Court denied Harris's motion, holding that the "[v]ague *post-trial* assertions by defense counsel" contained in the motion were not relevant to an assessment of whether the District Court erred by failing to order a competence hearing *during the trial.* Harris's App. 155 (emphasis added).

Harris argues that the District Court erred by denying his motion for reconsideration. We disagree. This Court reviews a District Court's denial of a motion for reconsideration under Fed.R.Civ.P. 60(b) for abuse of discretion. *Malik*, 293 F.3d at 561. We find no error, let alone an abuse of discretion, in the District Court's denial of Harris's motion, because Harris has not presented any persuasive reason why a request for a hearing in a post-trial motion is relevant to an assessment of the correctness of a ruling by the District Court during trial.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the District Court in all respects except that portion of the judgment which ordered that Harris be granted a new trial. That portion of the judgment is VACATED and REMANDED for the District Court to conduct a reconstruction hearing to determine whether or not the prosecutor's use of peremptory strikes complied with the requirements of the Constitution as outlined in *Batson.* The parties shall bear their own costs.